COMMONWEALTH *vs.* JAMES F. O'ROURKE & others.

Plymouth.   February 2, 1942. — March 30, 1942.

Present: FIELD, C.J., QUA, COX, & RONAN, JJ.

*Elections. Conspiracy. Evidence,* Failure to produce evidence. *Practice, Criminal,* Venue.

A finding of guilty of conspiring to make, sign, file and use false nomination papers for a certain candidate for public office was warranted against a defendant who was in charge of a headquarters for the candidate from which there had been sent out to be certified a considerable number of wholly forged nomination papers, which, to a person without special experience but having occasion to examine them might be found to have the appearance of being forged, and who employed and directed the other persons working at the headquarters and took charge of the papers until they were turned over to the candidate for filing; but evidence did not warrant a finding of guilty against a defendant who was an employee of the first defendant in charge of circulating the papers in a certain territory and who delivered

and called for some of the papers; nor against a defendant who was employed merely as a messenger to deliver and call for the papers, although he was told by certifying officials that they doubted the validity of the papers; nor against a defendant who was employed merely as a chauffeur by the first defendant.

Venue of an indictment for conspiracy to make, sign, file and use false nomination papers for public office was properly laid in a county wherein was situated one of several cities to which forged papers were taken for certification from the defendants' headquarters in another county, even though an agent of the defendants who took them there was innocent.

Evidence that a defendant charged with conspiracy to make, sign, file and use false nomination papers for public office had knowledge of the statutes which he conspired to violate was not necessary in order to prove his criminal intent.

At the trial of an indictment for conspiracy to make, sign, file, and use false nomination papers for public office, after the Commonwealth had introduced evidence that a number of papers were wholly forged, and testimony by several purported signers that they had not written their names on the papers, an inference adverse to the defendants could be drawn from their failure to call any of the purported signers as witnesses.

INDICTMENT, found and returned on October 10, 1940, and tried before *Forte*, J.

*J. P. White*, for the defendants.

*J. R. Wheatley*, Assistant District Attorney, for the Commonwealth.

QUA, J. The four defendants O'Rourke, Wallace, James S. Kerrigan, and Thomas J. Kerrigan, were indicted jointly, together with "John Doe and Richard Roe," whose true names and more particular descriptions are stated to be unknown to the grand jurors, in four counts for conspiracy to (1) file, (2) make, (3) sign, and (4) use false nomination papers to secure the placing upon the ballot of the name of William H. McMasters as a candidate for Governor. See G. L. (Ter. Ed.) c. 56, § 13, and G. L. (Ter. Ed.) c. 53, § 6, as amended, § 7, as amended, § 9. All four of the defendants specifically named have been convicted on each count.

A basic question is whether there was evidence to warrant the verdicts of guilty. The substance of the evidence tending to show the falsification of papers as it appears in the printed record and as it comes to us in the form of

original nomination papers and photostatic copies of papers submitted to the jury and incorporated by reference in the bill of exceptions is now set forth. A group of nomination papers in behalf of McMasters, certified by the registrars of voters of Quincy, was filed in the office of the Secretary of the Commonwealth. A second group of papers in behalf of McMasters, certified by the election commissioners of Boston, was filed in the same office. A third group of papers in behalf of McMasters was produced from the office of the city clerk in Brockton. The papers of this group were never certified and had remained in Brockton. Each of the papers in the three groups bore a printed number before which was printed the letter "G." All the signatures purporting to be those of voters on the Quincy, Boston and Brockton papers marked "G" were forgeries. The same handwritings appeared many times in different names on these papers and on papers filed from other places, but the same writing appeared only once or twice on each paper. The same group of handwritings, with some exceptions, appeared on the Quincy papers that appeared on the Brockton papers, and when the same handwriting appeared more than once on any particular paper it appeared on lines separated from each other by a number of other signatures. It could have been found that the same handwriting sometimes appeared in the names of both men and women voters. Five persons testified that signatures on the Brockton papers purporting to be theirs had not been made by them. Plainly this evidence warranted a finding that the three groups of papers marked "G" were false and fraudulent, and that they had been corruptly prepared by a number of persons who had conspired together for that purpose.

The next question is whether there was evidence to warrant the finding that the several defendants were members of the conspiracy. There was evidence of these facts: In the latter part of June, 1940, the defendant Wallace was introduced to the candidate McMasters. Wallace hired "a headquarters" in South Boston, and after the latter part of June was circulating McMasters's papers. On July 5 he hired an office in the Foresters' Building at K and

4th streets, stating that he wanted it "for the purpose of circulating nomination papers" for McMasters for Governor as the candidate of the "Old Age Pension Party." Wallace paid the rent and took a receipt in the name of the "National Old Age Pension Party." About July 15 or 16 Wallace hired a hall in the same building, which he occupied for three days, stating that he needed it "to check up on nomination papers coming back." There were in the hall two tables which the judge in his charge referred to as eight feet long. About fifteen or twenty men and girls went in and out. There were on the premises "election books" put out by the Boston election commissioners and "precinct books." On July 13, five hundred nomination papers were printed for Wallace who, when he ordered them, told the printer to call when they were ready either one of two telephone numbers, one of which was the number of the telephone at the Foresters' Building and the other of which was the number of a telephone installed in July, 1940, at "Forester's Hall" at the application and under the direction of the defendant O'Rourke, to be listed under the name of the "National Pension Party." When the printer did call one of these numbers "a man" came for the papers and left an order to print an additional five hundred. These were marked "E" and were called for by "a man," who gave an order to print a third five hundred papers. The papers of this third lot were the papers marked "G," of which the jury could find that the Quincy, Boston and Brockton papers introduced in evidence had been forged. Wallace paid for the first lot of papers. The two other lots were paid for by "the man" who called for them. On the night before the last day for filing papers McMasters received two hundred fifty papers from Wallace.

As to the defendant O'Rourke there was evidence that, besides arranging for the telephone, he was present when Wallace made inquiries about hiring the office, but "Wallace did all the talking"; that on fifty or seventy-five occasions O'Rourke had left McMasters's papers in the office of the Boston election commissioners, and he had signed receipts for them after they were certified.

As to the defendant James S. Kerrigan there was evidence that he assisted in carrying the tables upstairs to the hall; that his signature had been placed across the corner of the "G" papers from Quincy introduced in evidence; that he called at the office of the city clerk in Quincy, presented a receipt, and asked for the McMasters papers mentioned in it; that an assistant registrar of voters told him that "the papers did not look genuine" and that Kerrigan "should look them over"; and that he replied that he had nothing to do with getting the names and that to the best of his knowledge the people who had circulated the papers were getting proper signatures; that about July 24 James S. Kerrigan came for papers to the city clerk's office at Brockton in order to deliver them to McMasters's office; that James S. Kerrigan's name had been written on them by an employee in the city clerk's office as that of the person who had brought in the papers; that the city clerk told him that he did not like the looks of the papers and that they had not been certified; and that Kerrigan said he did not circulate them.

As to the defendant Thomas J. Kerrigan there was evidence (admitted against him alone) that he had stated in September, 1940, that in July he had taken a job "driving the defendant Wallace and others," and had received $200 for a month's work; and that he had driven the defendant O'Rourke to Boston City Hall on numerous occasions and had gone with him to a printing establishment to get papers.

There was evidence that all four of the defendants were seen daily at the Foresters' Building "until the tenancy was up the last part of July."

The defendant Wallace testified in substance that he agreed to circulate nomination papers for McMasters, hired the headquarters in the Foresters' Building, organized the circulation of papers in different parts of the State, employed O'Rourke at $40 a week for three weeks "to take charge of wards 6 and 7 of Boston," hired James S. Kerrigan as a messenger at $20 for one week and $25 a week for two weeks, hired Thomas J. Kerrigan at $8 a day as chauffeur and for the use of his car, employed "several

other men and women throughout the city of Boston and the State to solicit signatures," paying some by the week and others five cents apiece for each certified signature, directed O'Rourke to apply for the telephone, hired additional space in the building for three days, and employed several men and girls to check papers as they were brought in; that there were also volunteer workers; that he paid the bills out of his own funds; that he received at the start two hundred papers from McMasters and had five hundred more printed; that he directed O'Rourke to take the Boston papers as they came in to the office of the Boston election commissioners and to collect them upon certification; that he received the certified papers from O'Rourke and put them in a safe; that he sent James S. Kerrigan to Quincy, Brockton, New Bedford, and other cities to collect papers and to return them to the "headquarters"; that other papers were sent in by mail and still others brought in personally by workers; that he kept "these papers" at the "headquarters" until the night before the last day for filing, at which time he turned them over to McMasters; that he did not personally check or file any papers and did not enter into any agreement for signing, making or filing false nomination papers; and that he spent between $1,500 and $1,700 "for signatures, expenses and workers."

The defendant O'Rourke testified that Wallace employed him to solicit signatures; that he was given charge of the South Boston district; that persons soliciting in that district were paid three cents for each signature that "passed certification" by Wallace; that he himself took no part in the checking of signatures; that he spent part of his time out in the district and part of his time at "Forester's Hall"; that he did on numerous occasions take papers for certification to the office of the Boston election commissioners and signed his name in the receipt book; that he called for the papers that had been left for certification and delivered them to Wallace; and that he had applied for the telephone at Wallace's direction. He denied any part in the printing of any papers and denied entering into any

agreement to make, sign or file false nomination papers. On cross-examination he gave the names of three people who had worked for him soliciting signatures but could recall no others.

In the foregoing paragraphs we have endeavored to state the substance of all the evidence against the several defendants. From this it could have been found that many completely filled and wholly forged papers marked "G" (the Brockton papers alone containing approximately two thousand one hundred seventy forged names) had been sent out from the South Boston "headquarters" for certification by the local election officers; but there was no evidence that any of the forgeries was in the handwriting of any of the defendants or of any of those employed at the Foresters' Building; and there was no direct evidence that any of the defendants or anyone at the building knew that the papers were to be or had been forged. The question then is whether the evidence as a whole was such that it would support circumstantially a reasonable inference that any of the defendants in any manner procured the false signatures or participated with those who made the false signatures in the filing, making, signing, or use of the forged papers; and in this connection the appearance of the papers themselves may be considered. There is nothing about them that would lead a casual and inexperienced observer to believe them forged, but in our opinion the jury could find that even a person without special experience in such matters and not an expert on handwriting (see *Priorelli* v. *Guidi*, 251 Mass. 449), having occasion to examine these papers would be likely to notice the striking similarities in the handwritings of supposedly different persons recurring through the papers, sometimes at short intervals. There was also a certain appearance of regularity and uniformity about the "G" papers which it might be thought could scarcely be expected if they were signed at different times and places, when different kinds of pens, inks, and pencils might be expected to be used by different signers.

In our opinion there was evidence to warrant the verdict against the defendant Wallace. He could be found to have

been at the head of the enterprise at South Boston. He hired the office and the hall and employed, paid, and directed the other defendants and hired the persons employed to do the "checking," if checking was what they were doing. He took charge of the papers until he turned them over to the candidate for filing. Although Wallace denied that he personally checked any papers, it could have been found from the testimony of O'Rourke that he did pass upon the signatures from South Boston for the purpose of paying those who had secured them, and we think it permissible to infer that with so many persons employed by him "checking" signatures at one place, where he also was present, he must have become familiar with the character of the signatures and the appearance of the papers. We think that the jury could infer that, if Wallace did not himself commit or procure the forging of the signatures, at least he became aware of what was going on upon so large a scale and joined in the conspiracy with persons unknown who committed the forgeries. The jury might find the crime proved beyond a reasonable doubt as against Wallace, "although the inference of guilt from the facts established was not unescapable or necessary." *Commonwealth* v. *Bader*, 285 Mass. 574, 577.

There is less evidence against O'Rourke. He was merely an employee, although he had charge of "the circulation" of papers in South Boston. He is not shown to have had any connection with forged papers beyond taking them (so far as appears, with other papers not forged) to the office of the Boston election commissioners, and calling for them after they had been certified. It would be difficult to infer from this that O'Rourke ever examined the forged papers. He was seen at the Foresters' Building daily, but this adds little in the absence of evidence as to what he was doing there. In our opinion this evidence does not bridge the gap between suspicion and proof and did not warrant the conviction of O'Rourke. See *Commonwealth* v. *Connelly*, 163 Mass. 539, 543.

So far as appears the duties of James S. Kerrigan were merely those of a messenger. Although he too was seen at the Foresters' Building daily, he is not shown to have

had any closer contact with the forged papers than O'Rourke had. The fact that when he called for papers that had been left for certification at Quincy and at Brockton he was told by the local officers of their doubts about the papers does not prove that he joined in the conspiracy charged.

There is still less against Thomas J. Kerrigan. Being employed by Wallace as a chauffeur and being seen at the Foresters' Building daily, with no evidence of any contact with the papers, does not suffice to show complicity in the alleged conspiracy.

Venue was properly laid in the county of Plymouth, since the jury could find that the conspiracy involved the presentation of forged papers for certification at Brockton in that county. *Commonwealth* v. *Pettes,* 114 Mass. 307. *Commonwealth* v. *Saul,* 260 Mass. 97. *Hyde* v. *United States,* 225 U. S. 347. *Brown* v. *Elliott,* 225 U. S. 392. *The King* v. *Brisac,* 4 East, 164. See cases collected in Wharton's Criminal Law (12th ed.) § 1666, and in 15 C. J. S. 1116, § 83. And the act of presenting them was the act of the conspirators if performed by their agent, even if the agent was himself innocent. *Commonwealth* v. *Glover,* 111 Mass. 395. *Commonwealth* v. *White,* 123 Mass. 430, 433, 434. *Fore River Shipbuilding Corp.* v. *Commonwealth,* 248 Mass. 137, 140, 141. *Commonwealth* v. *Ober,* 286 Mass. 25, 31, 32.

The judge rightly declined to rule as requested by the defendants in substance that in order to prove the intent necessary for a criminal conspiracy there must be evidence that the defendants had knowledge of the law which they conspired to violate. The ruling requested involved a misapplication of the principle discussed in *Commonwealth* v. *Benesch,* 290 Mass. 125, 134, 135. That principle is a narrow one. It has no application where there is anything inherently wrong or inimical to the public interest in that which the defendants have combined to do. The making and use of false nomination papers is in its very nature wrongful and detrimental to the public interest. The doing of these acts can almost never be consistent with an innocent purpose. See *Commonwealth* v. *Adams,* 114 Mass. 323. One who joins in a conspiracy to that end may be found

to entertain a criminal intent regardless of his knowledge of the statutes. *Commonwealth* v. *Hunt,* 4 Met. 111, 123. *Commonwealth* v. *Waterman,* 122 Mass. 43, 56, 57. *Commonwealth* v. *Dyer,* 243 Mass. 472, 483, 485. There is nothing to the contrary in *Commonwealth* v. *Connelly,* 163 Mass. 539.

Other requests for rulings, in so far as they have been argued, require no further discussion. To have granted them to any greater extent than they were in substance given would not have been consistent with the grounds on which this opinion rests.

The defendants objected and excepted to a portion of the district attorney's argument, which they construe as an argument that the jury should draw inferences against the defendants for their failure to call as witnesses persons whose signatures purported to be affixed to the papers. Whether or not this is the true construction of the argument, there was no error in allowing it or in the charge of the judge wherein he permitted the jury to draw from this circumstance an inference adverse to the defendants as to the forging of the papers. It is frequently held that where a witness is equally available to either party no inference can be drawn against either for not calling him. *Fletcher* v. *Willis,* 180 Mass. 243, 244. *Jones* v. *Boston & Northern Street Railway,* 211 Mass. 552, 555. *Mikkelson* v. *Connolly,* 229 Mass. 360, 362, 363. *Cutler* v. *Jordan Marsh Co.* 265 Mass. 245, 247, 248. But there is no hard and fast rule to that effect. Whether an inference can be drawn from the failure to call witnesses necessarily depends, as with inferences generally, upon the posture of the particular case and the state of the evidence. Wigmore on Evidence (3d ed.) § 288. See *Commonwealth* v. *Finnerty,* 148 Mass. 162, 166, 167; *Harriman* v. *Reading & Lowell Street Railway,* 173 Mass. 28, 35, 38; *Commonwealth* v. *Peoples Express Co.* 201 Mass. 564, 581; *Little* v. *Massachusetts Northeastern Street Railway,* 229 Mass. 244, 246–248; *Mumford* v. *Coghlin,* 249 Mass. 184, 186, 187, 191; *Commonwealth* v. *Sacco,* 255 Mass. 369, 441–443. Compare *Heina* v. *Broadway Fruit Market, Inc.* 304 Mass. 608, 611, 612. Here the district attorney had already called five witnesses who had

testified that their names on the papers were not written by them. He had therefore done his part and had offered the challenge. The issue was vital to the case. So many names, with the corresponding addresses, were on the papers that if they were genuine it would seem an easy matter to call in a few of the signers. Yet the defendants, faced with the sweeping testimony as to the forgery of all the names, called none. We cannot say as a matter of law that this omission was wholly without significance.

The result is that the exceptions of the defendants O'Rourke, James S. Kerrigan, and Thomas J. Kerrigan are sustained, and the exceptions of the defendant Wallace are overruled.

*So ordered.*