## COMMONWEALTH vs. JOSEPH NIZIOLEK, JR.

Hampden.    January 9, 1980. — May 2, 1980.

Present: HENNESSEY, C.J., BRAUCHER, KAPLAN, LIACOS, & ABRAMS, JJ.

*Evidence,* Failure to produce witness, Intent, Convictions. *Practice, Criminal,* Instructions to jury, Argument by prosecutor. *Malice. Witness,* Impeachment. *Burning of Property.*

In the circumstances, the judge at a criminal trial did not err in permitting the prosecutor in closing argument to comment on the defendant's failure to call a particular witness. [517-522]

In the circumstances, the judge at a criminal trial did not err in instructing the jury that they could infer from the defendant's failure to call a particular witness that the witness would have testified adversely to the defendant. [523-524]

At a criminal trial, the judge's charge to the jury with respect to a pretrial statement by the defendant to the police properly left to the jury the question whether the statement was an admission inconsistent with innocence. [524-526]

At an arson trial, the judge erred in his charge to the jury in failing to define the term "malice," in instructing the jury that they could infer malice from certain acts without defining that term, and in his explanation of the intent required. [526-529]

At the trial of indictments charging the defendant with arson, burning insured property and larceny, the prosecutor's closing argument regarding a Federal tax lien on all the defendant's property was proper. [529-530]

A criminal conviction on which a sentence has not been passed is admissible under G. L. c. 233, § 21, to affect a witness's credibility. [530-531]

At a criminal trial, the judge did not abuse his discretion in refusing to admit records of criminal convictions of two prosecution witnesses after the testimony of both had been completed, almost at the close of the defendant's case. [531-532]

INDICTMENTS found and returned in the Superior Court on June 12, 1978.

The cases were tried before *Simons,* J.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Linda J. Thompson* (*Efrem A. Gordon* with her) for the defendant.

*Dianne M. Dillon,* Assistant District Attorney (*William Welch,* Assistant District Attorney, with her) for the Commonwealth.

HENNESSEY, C.J.   The defendant was tried to a jury on one indictment for burning a dwelling house (arson), one indictment for burning insured property, and four indictments for larceny of over $100.   He was found guilty on each of the six indictments.[1]   He was sentenced to concurrent two and one-half year terms in the Hampden County house of correction on the arson indictment and one larceny indictment and to three years probation on the indictment for burning insured property.   The remainder of the convictions were placed on file.   We reverse the conviction on the arson charge, and affirm the other judgments.

Prior to trial the defendant filed a motion requesting a continuance until the cases against his two codefendants, Melvin Davis and Raymond Bednarz (who had pleaded guilty to all charges), had been disposed of by way of imposition of sentence.   In this motion the defendant asserted that Raymond Bednarz was a potential defense witness but might assert his Fifth Amendment privilege against self-incrimination if called to testify prior to sentencing.   After a hearing the motion was denied.   A renewed motion for continuance was filed in which the defendant asserted that Raymond Bednarz had indicated that he would give essential exculpatory testimony only if sentenced first.   This motion was accompanied by the defendant's affidavit to the same effect.   The judge took no action on this motion.   As a result of the defendant's motion, the Commonwealth moved for sentencing in the Bednarz case, and Bednarz was sentenced prior to the resting of the Commonwealth in the instant case.

---

[1] A seventh indictment charging conspiracy to commit arson was still pending at the time of trial.

The judge, after a hearing, denied the defendant's motion for a new trial and for stay of execution of sentence. The judge filed findings with regard to adverse inferences arising from failure to produce the witness Bednarz. The defendant appealed his convictions and the denial of his motion for a new trial. The defendant's renewed motion for stay of execution of sentence was denied by the trial judge. The defendant then filed a motion for stay of execution of sentence pending appeal which was granted by a single justice of the Appeals Court. The defendant's appeal was transferred to this court on our own motion.

The defendant raises the following issues in this appeal: (1) whether the trial judge erred in ruling that the Commonwealth could comment to the jury on the failure of the defendant to call Bednarz as a witness; (2) whether the judge erred in instructing the jury that they could infer from the defendant's failure to call Bednarz that he would have testified adversely to the defendant; (3) whether the judge erroneously instructed the jury that the defendant's pretrial statement to police was an admission inconsistent with innocence; (4) whether the judge erred in instructing the jury concerning the elements of the crime of arson; (5) whether the Commonwealth's closing argument concerning a Federal tax lien on all the defendant's property was of such an improper and prejudicial nature as to require reversal of the defendant's convictions; (6) whether the judge erred in excluding from evidence certain records of criminal convictions of two of the prosecution witnesses.

We conclude that there was error in the judge's charge concerning the elements of arson and therefore we reverse the defendant's conviction on the arson indictment. Because there was no other error, we affirm the convictions of burning insured property and larceny over $100.

The facts may be summarized as follows. On November 23, 1976, a fire occurred at the defendant's three-family house located at 59-61 Sorrento Street in Springfield. The house was insured by Aetna Life and Casualty Company, from which the defendant received insurance payments for

a portion of the estimated cost of repair to the house, the contents of the house, and specific additional living expenses.

The Commonwealth presented no physical or scientific evidence of arson. Former Fire Chief Joseph McClellan testified that he responded to the fire and was of the opinion that it was incendiary in nature.

The main witness for the Commonwealth was Melvin Davis, who claimed to be the intermediary between Raymond Bednarz, the defendant's alleged agent for procuring an arsonist, and Norman Babineau, the man who actually set the fire. Davis's testimony set up the following chain of events. Davis first met the defendant through Raymond Bednarz at a time when Davis was employed by Bednarz on a part-time basis. In a conversation which took place at Bednarz's place of business in November, 1976, and which involved the defendant, Bednarz, and Davis, the defendant told Davis that he was in financial difficulty and that he would like to have his house "torched." On the evening this conversation occurred, Bednarz gave Davis $250 as a down payment on the cost of burning the defendant's house. Davis, in turn, gave this money to Norman Babineau. The following evening, Babineau came to Davis's home and the two made preparations for the fire and proceeded to the defendant's property where Babineau set the fire.

Davis saw the defendant the following day at Bednarz's place of business. The defendant showed Davis a picture of the burned house which had appeared in the morning newspaper. The defendant told Davis that he and Babineau had done a "good job." The defendant then gave Bednarz $500. Bednarz kept $250 as repayment of the $250 that he had already given Davis, and gave Davis $250 as the balance to be paid to Babineau for burning the house.

The Commonwealth also called Kenneth Ingram. He testified that he had known the defendant for about five years. Ingram stated that at the request of the defendant he went to the house on Sorrento Street one month before the fire in order to repair the roof. However, Ingram found the roof to be beyond repair. When Ingram informed the de-

fendant of the condition of the roof, the defendant replied, "I would like to burn the damn thing."

Approximately two weeks later Ingram was with the defendant and Raymond Bednarz at Bednarz's place of business. The defendant asked Ingram if he knew of anyone who would burn his house, or if Ingram would burn his house. Ingram responded negatively to both of these questions. About a week later the defendant telephoned Ingram at his home and asked once more if Ingram would find someone to burn the house. Ingram again rejected the defendant's request.

The Commonwealth introduced the defendant's pretrial statement through Officer Michael Dowd. The first paragraph stated that the defendant and Raymond Bednarz had had a conversation "[s]ometime in October of 1976" about having the defendant's house "torched." The remainder of the statement said that no arrangement had been made between the defendant and Bednarz to have the house burned. On cross-examination, Officer Dowd was unable to furnish any more detail on the substance of the October, 1976, conversation between Bednarz and the defendant; nor could he clarify whether it was Bednarz or the defendant who brought up the subject of arson. Raymond Bednarz was not called as a witness for the Commonwealth, although it was conceded that he was available.

The defendant took the stand on his own behalf. He stated that Davis and Ingram had come to him after the fire and announced that they were responsible for setting it. He also testified that they requested money which he refused to pay.

The defendant explained his October, 1976, conversation with Raymond Bednarz. He testified that Bednarz had mentioned torching the house in response to the defendant's complaints about repeated vandalism of the house. The defendant recalled having said that he did not want the house burned and that he was going to move into it. There was no further conversation between the two on the subject and no agreement was made.

1. The judge ruled that, under the particular facts of this case, it was permissible for the Commonwealth to comment

in closing argument on the defendant's failure to call Raymond Bednarz as a defense witness. As a result, the prosecuting attorney argued to the jury as follows: "Let me say that Bednarz was here and I could have called Bednarz if I so desired as a witness . . . . And let me ask you this, who would have gained by Bednarz getting on the stand to clarify the [defendant's pretrial] statement? Who would have gained? Niziolek."

The defendant contends that it was erroneous as a matter of State law to permit this comment. We disagree.[2] "We have in a series of cases, both civil and criminal, permitted, when justified, comment on a party's failure to call witnesses." *Commonwealth* v. *Franklin*, 366 Mass. 284, 292 (1974). "[S]ome of the most important factors which the judge should consider in deciding whether comment is to be allowed," *id.* at 293, will be discussed as they pertain to the facts of the instant case.

One crucial factor is whether the missing witness was available to the defendant. *Id.* The so called "missing witness" in the instant case, Raymond Bednarz, was indicted with the defendant and others for the arson of the defendant's house and a related crime. But verdict and sentencing were complete and unconditional in Bednarz's case prior to the Commonwealth's resting its case against the defendant. Thus, there was no impediment to Bednarz's being available as a witness on behalf of the defendant, and the judge so found.

The defendant argues that, at the time the Commonwealth sought leave of the court to make the comment in question here, Bednarz was equally available to both parties and that this situation should have precluded the Commonwealth's comment. However, "[a]lthough it has been fre-

---

[2] As we observed in *Commonwealth* v. *Franklin*, 366 Mass. 284, 294 (1974), "[e]ven though comment may be warranted, it does not necessarily follow that it should, in the judge's discretion, be permitted. We have stated in a number of cases that the judge's discretion in allowing the inference should be applied cautiously and with a strict regard for the rights of persons accused."

quently held that where a witness is equally available to either party no inference may be drawn against either for not calling him, there is no hard and fast rule to that effect. *Commonwealth* v. *O'Rourke*, 311 Mass. 213, 222 (1942). The inference had been permitted against the defendant, even in cases where the witness appeared to be equally available to both parties, when it also appeared that the posture of the case was such that the defendant would be naturally expected to call the witness. See *Commonwealth* v. *De-Caro*, 359 Mass. 388, 391-392 (1971)." *Commonwealth* v. *Franklin*, 366 Mass. 284, 293 (1974). To the extent that any language in *Commonwealth* v. *Crespo*, 3 Mass. App. Ct. 497, 501 (1975), is inconsistent with the proposition just quoted, we disapprove that language. See *United States* v. *Young*, 463 F.2d 934, 942 (D.C. Cir. 1972).

The defendant argues further that our cases also require that the missing witness be more likely to be known to the defendant than to the representatives of the government. Again this interpretation misconceives the inquiry by attempting to create hard and fast rules whereas in fact "[n]o case purports to state those conditions required as a minimum before the inference is permissible." *Commonwealth* v. *Franklin, supra* at 292. The *Franklin* case does state that, in addition to the other pertinent factors, "the judge *may* consider whether the defendant has superior knowledge of the identity of the witness and his whereabouts" (emphasis added). *Id*. at 293. Without placing an inordinate amount of weight on this factor we observe that Bednarz was (according to the defendant's own testimony) a "friend" of the defendant.

Other factors mentioned in *Franklin* as bearing upon our present inquiry include "the posture of the . . . case and the state of the evidence." *Id*. at 292-293, quoting from *Commonwealth* v. *O'Rourke*, 311 Mass. 213, 222 (1942). More specifically, our cases indicate that the jury should not be permitted to draw adverse inferences from the failure of a defendant to call a witness "unless the evidence against him is so strong that, if innocent, he would be expected to call

[the missing witness]." *Id.* at 293, quoting from *Commonwealth* v. *Finnerty*, 148 Mass. 162, 167 (1889). This criterion is clearly fulfilled in the instant case. The Commonwealth introduced evidence that the defendant had said that he had financial difficulties and would like to burn his house, and that on two subsequent occasions he had asked Ingram if he knew of anyone who would burn it. The Commonwealth also presented the testimony of Melvin Davis describing the formulation and execution by the defendant, Bednarz, Davis, and Babineau of the plan to burn the defendant's house, including the details of the payments made to the parties involved. Moreover, there was also in evidence the fact that the defendant had collected on his insurance claims for the house. Finally, there was the defendant's pretrial statement regarding his conversation with Bednarz. Clearly, Bednarz would be the one person who could corroborate the explanation of that conversation which the defendant offered on the witness stand. Thus, if the defendant were innocent, he could be expected to call Bednarz to nullify this potentially devastating piece of evidence. Therefore, we conclude that the posture of the case and the state of the evidence before the jury were such that comment by the prosecution on the defendant's failure to call Raymond Bednarz was proper as a matter of State law.

The defendant also argues that, in concluding that this was an appropriate case for comment, the judge considered certain information that was not before the jury, viz., that the defendant had made efforts before trial to have Bednarz made available as a defense witness. The defendant suggests that it was improper for the judge to rely on matters not in evidence (such as the defendant's pretrial motions and affidavits) when ruling in favor of allowing comment.

We agree with the defendant's basic contention that the judge should permit the comment in argument of counsel, and refer to the unfavorable inference as permissible, in his charge to the jury, only if those rulings are warranted, based solely on the evidence heard by the jury. Nevertheless, we do not accept the defendant's conclusion, for two reasons.

First, it is by no means clear from the trial transcript (on which the defendant relies in making this contention) that the judge actually relied on the defendant's pretrial motions and statements in allowing the comment. The defendant draws our attention to a lobby conference involving counsel for the Commonwealth and the defendant at which the judge stated to the defense attorney, "There is actually nothing hanging over Bednarz' head now as a result of what I would call your activity on behalf of your own defendant, properly done, and I'm not suggesting any impropriety or any bad motive, but as a result of your actions, the Commonwealth brought forward disposition on Bednarz. Bednarz was disposed of, and I disposed of him myself and there is nothing hanging over his head. He can come in here and supply all kinds of exculpatory evidence as far as the defendant is concerned." This statement of the judge, which is his only significant pronouncement on the subject, merely indicates that the judge found that Bednarz was currently available to be called by the defendant, in keeping with the requirement of the *Franklin* case. It does not, in our opinion, constitute a pronouncement that the judge intended to allow comment on Bednarz's nonappearance because the defendant once sought to have him made available, a fact known to the judge but not to the jury.

Second, it is clear from our discussion above of the posture of the case and the state of the evidence that the prosecutor was warranted in making his comment and the jury were warranted in drawing a negative inference based solely on the evidence that was actually before the jury. Therefore, an effort on our part to divine whether any additional factors influenced the judge's decision to allow the comment would be superfluous at best.

The defendant further contends that the comment to the jury by the prosecution concerning the defendant's failure to call Bednarz violated the defendant's Fourteenth Amendment right to due process of law by shifting the burden of proof to the defendant. It is well established that the Commonwealth bears the burden of proving each and every ele-

ment of the crime beyond a reasonable doubt, *In re Winship*, 397 U.S. 358, 364 (1970); *Mullaney* v. *Wilbur*, 421 U.S. 684 (1975), and the jury were so instructed.[3] The adverse inference in no way shifts this burden. The proper stature of a permissible inference adverse to a defendant was elucidated in *Gilbert* v. *State*, 36 Md. App. 196, 208 (1977), in the following manner. "The possibility of such an inference being drawn does not impose an unconstitutional burden upon a defendant. The State still bears the burden of persuasion beyond a reasonable doubt. The fact finder need not draw the permitted factual inference. In a jury case, the defendant is entitled to an appropriate instruction telling the jury that they should not so infer unless they are persuaded of the truth of the inference beyond a reasonable doubt. The only 'burden' upon a defendant is the purely tactical decision of choosing to controvert the State's proof so as to help insure a reasonable doubt. (This is not a burden in the constitutional sense in which *Mullaney* v. *Wilbur* and *In re Winship* speak.) To the extent to which the fact finder believes the defensive testimony, it is unlikely that he will draw the permitted inference beyond a reasonable doubt. To the extent to which the defensive testimony is disbelieved, the likelihood that the inference will be drawn becomes proportionately greater. The interplay of these possibilities is handled by the appropriate allocation of the heavy burden of persuasion to the State. This is the sum total of the constitutional protection in this regard to which a defendant is entitled."

---

[3] The judge instructed the jury as follows: "Let me discuss with you first the presumption of innocence. This defendant is presumed to be innocent . . . and a defendant is not to be found guilty on suspicion or conjecture but only upon evidence produced in this Court.

". . . .

"Now, as to the burden of proof. The burden is on the Commonwealth to prove beyond a reasonable doubt . . . that the defendant is guilty of the charges made against him. . . . There is no duty resting on the defendant to prove or otherwise establish his own innocence. Before there can be a conviction of the defendant, the Commonwealth must prove each and every element of the alleged crimes . . . beyond a reasonable doubt."

2. The defendant alleges several infirmities in the judge's instruction concerning adverse inferences. First, the defendant argues that the instruction was unfair because he had no advance warning that it would be given, nor any opportunity to present to the judge his reasons why the instruction should not be given. Cf. *Commonwealth* v. *Franklin*, 366 Mass. at 294-295. However, our reading of the record reveals a colloquy among the judge and both counsel which took place at a lobby conference prior to the resting of the defendant's case.[4] In this conference the judge clearly stated, among other things, that he would permit both sides to argue unfavorable inference to the jury. Also, the judge denied defense counsel's request that the jury be instructed that neither side was entitled to an inference, although defense counsel argued that such a charge was appropriate under the *Crespo* case, *supra*. As this colloquy indicates, the instruction could have come as no surprise to the defendant. Moreover, the defendant did state to the judge the reasons why he did not want the instruction. Therefore, he cannot now claim any unfairness on the basis of lack of warning or opportunity to present reasons in opposition to the instruction.

The defendant also argues that the instruction invaded the province of the jury by directing them to draw an inference adverse to the defendant. We do not agree that the jury were so directed. First, the judge gave a lucid and accurate general description of inferences and their proper role. Speaking more specifically of the inference permissible from the defendant's failure to call Raymond Bednarz, the judge added: "Now, as to the matter of a witness by the name of Raymond Bednarz, a potential witness in this case not appearing and testifying. *You may draw* a negative inference adverse to the defendant from the defendant's failure to call Raymond Bednarz as a witness for the defense.

---

[4] In discussing the matter with the judge prior to closing arguments the prosecutor followed the suggestion of this court in *Franklin, supra* at 294-295, that the issue whether the inference is permissible preferably should be the subject of such a conference.

*You are not compelled to do so. You may and that is for you to say,* and by that I mean it's an inference that if Raymond Bednarz did testify, then he would testify adversely to the defendant" (emphasis supplied). It is readily apparent that these instructions direct no inference but merely leave the jury to decide whether or not to draw a negative inference from the state of the evidence.

The defendant argues further that the judge's instruction violated the defendant's Sixth Amendment right to confront the witnesses against him. See *Pointer* v. *Texas,* 380 U.S. 400, 403-404 (1965). The defendant's theory is that once the judge instructed the jury that they could draw an inference that if Raymond Bednarz did testify then he would testify adversely to the defendant, Bednarz became in fact a witness adverse to the defendant and impervious to impeachment or discredit. This attack fails because the witness was available to testify if the defendant chose to call him. The Commonwealth did nothing to impair the availability of Bednarz at the defendant's trial. On the contrary, the Commonwealth moved successfully for sentencing in Bednarz's case, thereby removing any Fifth Amendment impediment to Bednarz's testifying at the defendant's trial. It was made clear to the defendant in the lobby conference described above that if Bednarz were not called, the jury would be instructed that they could draw a negative inference. Nevertheless, the defendant freely chose not to call him. The defendant will not now be heard to claim that he was deprived of the right to confront a witness whom he knowingly elected not to call.

3. During its case-in-chief, the Commonwealth introduced the defendant's written statement in evidence through Officer Dowd. In the first paragraph of this statement, the defendant said that in October, 1976, he had had a conversation with Raymond Bednarz about having his house "torched." The remainder of the statement indicated that the defendant never made an arrangement to have his house burned. Officer Dowd had no personal knowledge of either the character or the substance of the October, 1976, conversation.

The defendant was the only witness who had personal knowledge of the manner and content of the conversation. He testified that Bednarz had suggested that the house be "torched" as a solution to the defendant's vandalism problems. He stated that he rejected this suggestion and that the subject was never brought up again.

It is the defendant's contention that the judge's instructions to the jury on the subject of the defendant's pretrial statement usurped the fact-finding function of the jury by directing the conclusion that the defendant's statement was an admission inconsistent with his claim of innocence, thus allowing the jury to decide merely whether the defendant had made the statement. We think that, fairly interpreted as a whole, the judge's charge properly left to the jury the question whether the statement was an admission and the weight to be attached to it. If the initial portion of the charge implied a belief on the part of the judge that the defendant's statement did indeed constitute an "admission," this was offset by such subsequent phrases as "[w]hether there has been an admission is a question of fact to be found by the jury" and "[i]f you find that this defendant at any time said anything . . . inconsistent with his present claim of innocence, you have a right to consider this . . . ." Moreover, the closing sentence of that portion of the judge's charge succinctly and accurately clarified the respective roles of the judge and jury, placing with the jury the responsibility to find the facts and apply the law as explained to them by the judge. Additionally, the judge had warned the jury at two prior times in the course of his charge as follows: "If you believe that I have expressed or intimated any opinion as to the facts, you should disregard it" and "if I, in this charge, give you an indication as to what the facts should be, and I will attempt not to . . . you should simply disregard it. It's only your belief as to the evidence, to the weight of the evidence and to the strength of the evidence in inducing a belief in you that matters."

Finally, there is a logical reason, apart from our analysis of the judge's language, which assures us that no fatal con-

fusion was wrought by the charge in question. The defendant claims that the jury must have interpreted the charge as an instruction to them to decide not whether the defendant's statement was an "admission" but only whether he had made the statement. There is little danger, however, that the jury would make such an interpretation because the defendant himself had taken the stand and essentially confirmed that he made this statement. In other words, there was no dispute between the parties on that ground, and therefore it was clear to the jury that their task was to characterize and weigh the statement, and not merely to decide the uncontested fact that the defendant had said it.

4. We agree with the defendant's contention that there was error in the judge's instruction on the elements required for an arson conviction. The judge charged the jury in the following language. "The first indictment which is . . . the one commonly called arson . . . charges this defendant . . . did wilfully and maliciously set fire to, burn or cause to be burned a dwelling house . . . . [T]his is a violation of our Massachusetts General Laws, Chapter 266, Section 1, and I'm going to refer to that right now. . . . In order to find the defendant guilty of this crime, the Commonwealth must prove beyond a reasonable doubt — and here are the elements, first, that the defendant wilfully and maliciously, second, burned or caused to be burned or aided, counseled or procured, third, the burning, and fourth, of a dwelling house. The statute's use of both wilful and malicious does not indicate a requirement that malice has a meaning different from its ordinary meaning in criminal law and malice in criminal law in this case is a little different from malice as used in common English usage. Malice which is a necessary element in the crime of arson need not be expressed. Malice may be inferred from the wilful act of setting the fire or causing the fire to be set."

The first deficiency in this charge is the judge's failure to give the jury any definition of the term malice — a necessary element of the crime of arson. The judge's charge merely told the jury that they could not rely on the "com-

mon English usage" of malice, and implied that the term should be given its "ordinary meaning in criminal law." However, the judge never defined the ordinary meaning given to "malice" in criminal law. It would have been sufficient for him to charge in the language of *Commonwealth* v. *York*, 9 Met. 93, 104 (1845), that malice "characterizes all acts done with an evil disposition, a wrong and unlawful motive or purpose; the wilful doing of an injurious act without lawful excuse." See also *Commonwealth* v. *Goodwin*, 122 Mass. 19, 35 (1877).

This failure to define one of the elements of the offense charged required the jury to speculate in reaching its decision. The jury could not determine, without knowing what malice meant in the context of this case, whether the Commonwealth had carried its burden of establishing the existence of this element beyond a reasonable doubt. See *In re Winship*, 397 U.S. 358 (1970); *Mullaney* v. *Wilbur*, 421 U.S. 684 (1975); *Commonwealth* v. *Rodriguez*, 370 Mass. 684, 687 (1976).

The deficiency in the charge was compounded by the judge's statement that "[m]alice may be inferred from the wilful act of setting the fire or causing the fire to be set." Allowing the jury to draw an inference of malice without having defined that term is in direct contradiction of our case law (see *Gagne* v. *Commonwealth*, 375 Mass. 417, 422 [1978]; cf. *Commonwealth* v. *LaMothe*, 343 Mass. 417, 420 [1961]), and tends to create a situation in which the jury can convict without finding that each element of the crime was proved beyond a reasonable doubt. See *Sandstrom* v. *Montana*, 442 U.S. 510, 523-524 (1979).

The third problem with the judge's instructions relative to the arson charge was in his explanation of the intent requirement. During his specific discussion of the arson count the judge explained nothing to the jury about the intent necessary for an arson conviction, mentioning only that the defendant must act "wilfully." However, prior to his specific discussion of the elements of the individual crimes with which the defendant was charged the judge undertook

a general discussion of the intent requirement in the following terms. "Intent is a state of mind. The intention of a person . . . is to be ascertained by his acts and the inference is to be drawn from what is externally visible. Intent ordinarily cannot be proven directly because there is no way of reaching into and examining the operations of the human mind, but you may determine the defendant's intent from any statement or act done or act omitted and all the other circumstances which indicate his state of mind, provided you first find that any or all of such circumstances occurred. A person is presumed to intend the natural and probable consequences of his own acts."

The flaw in this portion of the charge is in the final sentence. "The words chosen by the judge came perilously close to establishing a presumption in favor of the Commonwealth which the defendant must overcome." *Commonwealth* v. *Collins,* 374 Mass. 596, 600 n.2 (1978). See *Sandstrom* v. *Montana, supra* at 524. The addition of this final sentence to the judge's explanation of the intent requirement served, in the circumstances of this case, to do nothing except imperil the presumption of innocence which is the defendant's due process right. See *In re Winship,* 397 U.S. 358 (1970); *Mullaney* v. *Wilbur,* 421 U.S. 684 (1975).

Although this ill-chosen sentence in the general instructions on intent apparently was meant to apply to the intent requirement of all three felonies with which the defendant was charged, we conclude that it did not fatally infect the respective charges on burning insured property and larceny for two reasons. First, the charges on those two crimes were not flawed by any definitional deficiency as was the arson charge. Second, the judge added an acceptable explanation of the intent requirement to his specific charges on burning insured property and larceny, which was conspicuously lacking from his charge on arson.[5]

---

[5] The judge spoke as follows regarding the intent required for the crime of burning insured property. "The elements of this crime which the Commonwealth must prove beyond a reasonable doubt to your satisfaction are one, that the defendant caused the property to be burned, two,

We conclude that, viewed as a whole, the jury instructions relative to the crime of arson were so flawed as to deprive the defendant of his due process right to be acquitted unless the Commonwealth proves every element of the crime beyond a reasonable doubt. Therefore we reverse the defendant's conviction of the crime of arson.

5. The defendant contends that the prosecutor's closing argument regarding a Federal tax lien on all the defendant's property was of such an improper and prejudicial nature as to require reversal of his convictions. The argument was as follows.

THE PROSECUTOR: "Let me ask you this. What do you get in trouble with the I.R.S. for?"

DEFENDANT'S COUNSEL: "Objection, your Honor."

THE PROSECUTOR: "What do you get in trouble with the I.R.S. for where, in fact, they filed . . . ."

DEFENDANT'S COUNSEL: "My exception."

THE PROSECUTOR: "A tax lien. Five Thousand Dollars. . . . We've introduced that in evidence. . . . He paid in June 30th of 1976."

There was evidence before the jury that there had been a Federal tax lien of approximately $5,000 against all the defendant's property and that the lien was satisfied prior to the fire by the sale of property other than the Sorrento Street house. The defendant argues that the prosecutor's comments were irrelevant, confusing and constituted an impermissible attack on the defendant's character.

---

that the property was insured, three, that the defendant had the intent to injure or defraud the insurer and as in the arson case, intent may be inferred from the circumstances or the setting of the fire."

The judge gave the following explanation of the intent required for larceny. "Still again, the wrongful taking of personal property from the possession of another with intent to deprive them of such property permanently. The necessary intent need not be proved directly but may be inferred from all of the facts. Intent may be found if one takes property without authority and uses it as to show indifference as to whether the owner recovers possession or not. Obtaining property by false pretense is a form of larceny which consists of knowingly making false representations of a fact made with the intent that the alleged victim rely on it by means of which the personal property of another is obtained."

We do not agree. It is settled that, where property has been burned and insurance paid, the prior financial situation of the defendant is admissible to establish a motive for the crime. See *Commonwealth* v. *Reynolds*, 338 Mass. 130, 133 (1958). Thus, it was clearly permissible for the prosecutor, in his closing argument, to refer to such evidence in an effort to get the jury to infer motive from it. The prosecutor did not distort the evidence by his comment. Instead he referred accurately to the amount of the lien and even noted that it had been paid off at a date prior to the fire. If there was any overzealousness or improper suggestion in the prosecutor's remarks it was slight and was cured by the judge's charge that the arguments by counsel are not evidence and that counsel's beliefs about the facts, if conveyed, are to be disregarded by the jury. See *Commonwealth* v. *Nordstrom*, 364 Mass. 310, 313 (1973).

6. During the course of the Commonwealth's case, Kenneth Ingram and Melvin Davis testified. Each of them had been involved in criminal activity in the past, and defense counsel sought to take advantage of this to impeach their credibility.

When Kenneth Ingram was on the stand, defense counsel sought to introduce the records of convictions obtained the previous day for masked armed robbery and assault and battery with a dangerous weapon. The judge ruled that evidence of these convictions was inadmissible under G. L. c. 233, § 21 (as amended through St. 1974, c. 502),[6] because Ingram had not yet been sentenced.

---

[6] "The conviction of a witness of a crime may be shown to affect his credibility, except as follows:

"First, The record of his conviction of a misdemeanor shall not be shown for such purpose after five years from the date on which sentence on said conviction was imposed, unless he has subsequently been convicted of a crime within five years of the time of his testifying.

"Second, The record of his conviction of a felony upon which no sentence was imposed or a sentence was imposed and the execution thereof suspended, or upon which a fine only was imposed, or a sentence to a reformatory, prison, jail, or house of correction, shall not be shown for such purpose after ten years from the date of conviction, if no sentence was imposed, or from the date on which sentence on said conviction was imposed,

Similarly, when Melvin Davis was on the stand defense counsel sought to introduce several convictions of Davis which were based on guilty pleas, including his conviction as an accomplice in the very case in which he was testifying. Again the judge ruled these inadmissible under G. L. c. 233, § 21, because Davis had not yet been sentenced.

The defendant argues that the judge's decision not to allow these records of conviction to be shown to the jury was prejudicial error and grounds for reversal. Clearly the judge erred in ruling that G. L. c. 233, § 21, does not permit the introduction of a prior conviction to affect a witness's credibility unless the witness has already been sentenced. This ruling is in conflict with the explicit language of the statute, specifically the last sentence of paragraph two: "[A] plea of guilty or a finding or verdict of guilty shall constitute a conviction within the meaning of this section." [7] However, no reversible prejudice resulted from this erroneous ruling because the trial judge later realized that his interpretation

whether the execution thereof was suspended or not, unless he has subsequently been convicted of a crime within ten years of the time of his testifying. For the purpose of this paragraph, a plea of guilty or a finding or verdict of guilty shall constitute a conviction within the meaning of this section.

"Third, The record of his conviction of a felony upon which a state prison sentence was imposed shall not be shown for such purpose after ten years from the date of expiration of the minimum term of imprisonment imposed by the court, unless he has subsequently been convicted of a crime within ten years of the time of his testifying.

"Fourth, The record of his conviction for a traffic violation upon which a fine only was imposed shall not be shown for such purpose unless he has been convicted of another crime or crimes within five years of the time of his testifying."

[7] This sentence was a result of a 1950 amendment which effectively overrules the holdings of such cases as *Boston* v. *Santosuosso,* 307 Mass. 302 (1940), and *Commonwealth* v. *Hersey,* 324 Mass. 196 (1949), that the word "conviction" in the statute means a final judgment and sentence of the court and merely showing a verdict of guilty does not satisfy the statute. St. 1950, c. 426. The fact that many "notorious criminals" with no "convictions" on their records often gave testimony with the jury ignorant of their criminal history gave impetus to the 1950 amendment. Twenty-Fifth Report of the Judicial Council, Pub. Doc. No. 144, at 39 (1949), reprinted in 34 Mass. L.Q. (No. 5) 21 (1949).

of the statute was incorrect and allowed defense counsel to introduce the records of convictions of Ingram and Davis for which they had not yet been sentenced. Thus the defendant ultimately was not deprived of his opportunity to attack the credibility and point up the possible motive for testifying of the two chief prosecution witnesses. See *Davis* v. *Alaska,* 415 U.S. 308 (1974).

After the testimony of both Davis and Ingram had been completed, almost at the close of the defendant's case, the defendant offered as exhibits additional records of criminal convictions of the two which had not been offered earlier when they were on the stand. The judge refused to admit as exhibits the records offered at that late point. There was no error. The exclusion was a permissible exercise of the judge's discretion. At the time the two witnesses testified, defense counsel, for no enunciated reason, simply had not obtained the records. This was not accomplished until nearly the close of the case. The defendant cannot now complain of the exclusion of this cumulative evidence which should have been introduced, if at all, at the time that the witnesses were on the stand. The judge also, in exercising his discretion, may well have considered that admission of the records when finally offered could have brought special emphasis to the records and thus given the defendant an unwarranted advantage.

7. It follows that as to the indictment for arson the judgment is reversed and the verdict set aside. As to the indictments for larceny and burning insured property the judgments are affirmed.

*So ordered.*