**Charles G. LEWIS, Appellant,**

v.

**STATE of Alaska, Appellee.**

**Nos. A–3699, A–3700.**

Court of Appeals of Alaska.

Nov. 12, 1993.

John C. Pharr, Law Offices of John C. Pharr, Palmer, for appellant.

Cynthia L. Herren, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS, and MANNHEIMER, JJ.

## OPINION

BRYNER, Chief Judge.

Charles G. Lewis was convicted of misconduct involving a controlled substance in the fourth degree (possession of cocaine), tampering with physical evidence, and misconduct involving a controlled substance in the third degree (possession of cocaine with intent to distribute). Lewis appeals, claiming that the trial court erred in failing to suppress evidence seized as a result of an improperly issued search warrant and that the court erred in refusing to declare a mistrial due to the prosecutor's improper closing argument. We affirm.

## FACTS

In July of 1989 Charles Lewis agreed to advance Eric Long a half-kilogram of cocaine; Long was to pay Lewis approximately $13,000 for the cocaine after selling it. Although Lewis and Long were both from Anchorage, Long planned to sell the cocaine in Seward. On August 2, Long enlisted two friends, Debbie Jones and Susie Sander, to help in the venture. Jones, who had lived in Seward, was to solicit customers; Sander was to monitor the amounts sold.

Sander and Jones were prepared to leave for Seward as soon as Long received the cocaine from Lewis. On the evening of August 3, Long called Lewis to confirm that everything was ready, then picked the cocaine up at Lewis' house. Long then gave the cocaine to Sander. Sander and Jones, however, had been unable to obtain a scale to divide the cocaine into smaller quantities. Long telephoned Lewis and arranged for Lewis to loan his scale to Sander. Sander drove back to Lewis' home, and Lewis gave her the scale. Sander and Jones then drove to Seward.

Long evidently contemplated selling the cocaine an ounce at a time and instructed Jones and Sander to charge at least $1,300 per ounce, a price sufficient to pay back Lewis and leave Long a profit of $7,000—$10,000. Long told Jones and Sander that they could keep any profit over that amount. Jones was confident she could sell the entire half-kilogram within three to five days.

Upon arrival in Seward, however, Jones began selling the cocaine in smaller amounts and for less money than anticipated. Moreover, Jones and Sander both began to use the cocaine themselves. When Long visited Sander and Jones in Seward on August 8, they had sold only a small portion of the cocaine and had obtained less than four thousand dollars. Long became upset that the women had sold so little cocaine and had broken the stash down into such small quantities. Sander gave Long $3,200, and Long returned to Anchorage

and gave the money to Lewis. At some point after returning to Anchorage, Long agreed to give $10,000 worth of stock that he owned in a local television station to Lewis as payment for the balance owed on the cocaine.

Jones and Sander continued to have problems following Long's August 8 visit. Their relationship began to deteriorate. On August 13, Sander became sick after smoking too much cocaine; she fled the apartment she shared with Jones and eventually walked to the Seward police station. The police called an ambulance, since Sander appeared to be suffering from a drug overdose. On the way to the hospital, paramedics found cocaine on Sander's person. Sander was arrested several hours later, after she regained consciousness.

Upon being questioned by the police, Sander explained her involvement with Jones and Long in the cocaine distribution plan. The police questioned Jones, who confirmed Sander's statements. Sander and Jones also told the police that Long had received the cocaine from Lewis. Sander gave a description of Lewis and his trailer. She told the police she had been there twice, once before the plan to distribute the cocaine had been formed and again to pick up the scale.

Based on the information they received from Sander and Jones, and with Jones' cooperation, the police arranged to monitor and record a telephone call from Jones to Long.[1] During the call, Jones informed Long that the police had seized scales and other "odds and ends" from her house. Jones also asked if Long thought Lewis was likely to hurt her. Long assured Jones that Lewis would not harm her and that the "situation would be taken care of." Long told Jones that he had already paid Lewis for the cocaine with the stock.

On August 17, 1989, the state applied to Magistrate Eugene Murphy for a warrant to search Lewis' trailer. In support of the warrant, Alaska State Trooper Randy Crawford and Anchorage Police Investigator Linda O'Brien testified about the infor-

---

1. The police first secured a warrant pursuant to *State v. Glass,* 583 P.2d 872, 881 (Alaska 1978).

mation they had received from Jones and Sander and about the recorded telephone conversation between Jones and Long. Magistrate Murphy found probable cause to believe that evidence implicating Lewis in the cocaine distribution scheme would be found in his trailer and issued a search warrant.

The police executed the search warrant that night, entering Lewis' residence as Lewis was flushing cocaine down his toilet. The search nevertheless yielded a quantity of cocaine, as well as a police scanner, a booklet about cocaine, a telephone scrambler, $11,625 in cash, and a promissory note from Long to Lewis. Lewis' charges followed.

### SUPPRESSION ISSUES

Prior to trial, Lewis moved to suppress the evidence seized from his trailer. He claimed that the warrant had been based on inadequately verified hearsay, that material misstatements and omissions had been made to the magistrate, and that the information relating to Lewis was stale by the time the warrant was issued. Superior Court Judge Rene J. Gonzalez denied Lewis' motion. On appeal, Lewis renews the arguments he raised below.

#### 1. *Probable Cause*

■ We first take up Lewis' claim that the warrant lacked probable cause because it was based on inadequately verified hearsay. A judge's decision to issue a search warrant is subject to reversal only when clearly erroneous. *State v. Bianchi*, 761 P.2d 127, 129–30 (Alaska App.1988). We give great deference to the issuing court's findings, upholding the court's determination in doubtful or marginal cases. *Metler*

*v. State*, 581 P.2d 669, 673 (Alaska 1978); *Kvasnikoff v. State*, 804 P.2d 1302, 1306 (Alaska App.1991).

■ When a warrant is based on hearsay statements of an informant, the *Aguilar–Spinelli*[2] doctrine applies. *See State v. Jones*, 706 P.2d 317, 321, 324 (Alaska 1985). This doctrine requires the issuing court to be given evidence enabling it to independently determine, first, that the informant's source of information is reliable, and, second, that the informant was truthful in communicating the information to the authorities. *Id.* at 320–21.

In the present case, the challenged warrant was based on the hearsay statements of Sander and Jones, as related to the magistrate by Officer O'Brien and Trooper Crawford. Lewis contends that Sander and Jones were members of the criminal milieu and must be treated as police informants for purposes of the *Aguilar–Spinelli* doctrine. Lewis acknowledges that the information Sander and Jones gave to the police concerning their own involvement in cocaine sales with Long was based on personal knowledge and satisfied the first prong of *Aguilar–Spinelli*. He asserts, however, that the second prong of *Aguilar–Spinelli* was not met, because neither Sander's nor Jones' truthfulness was established.

■ The record fails to support Lewis' assertion. Much of the information disclosed to the police by Sander and Jones was corroborated, either circumstantially or by independent police investigation.[3] Moreover, the statements of both women were substantially against their penal interest.[4] Further, Sander's and Jones'

---

**2.** *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964).

**3.** For example, Sander's possession of a substantial quantity of cocaine and Jones' possession of scales suitable for weighing cocaine tended to corroborate their statements. Sander and Jones were also able to lead the police to Lewis' Anchorage residence and accurately described Lewis and identified his car. Contrary to Lewis'

assertion on appeal, corroborating information need not be *per se* incriminatory to satisfy the *Aguilar–Spinelli* test. *See Schmid v. State*, 615 P.2d 565, 576 (Alaska 1980).

**4.** *See State v. Jones*, 706 P.2d 317, 325 (Alaska 1985); *State v. Malkin*, 678 P.2d 1356, 1359 (Alaska App.1984), *rev'd on other grounds*, 722 P.2d 943 (Alaska 1986). *Cf. State v. Bianchi*, 761 P.2d 127, 131 (Alaska App.1988).

Lewis claims that *Clark v. State*, 704 P.2d 799 (Alaska App.1985), holds that for admissions

statements were cross-corroborative.[5] Finally, Long's statements to Jones during the recorded telephone call independently confirmed both Long's and Lewis' participation, thereby substantiating Sander's and Jones' statements. We find sufficient information to establish the veracity of the statements made by Sander and Jones.

 Lewis nevertheless further contends that most of the information Sander and Jones gave concerning Lewis' involvement with Long was based on Long's hearsay statements to Sander and Jones. Lewis submits that this second-hand hearsay was unreliable. Statements attributed by Sander and Jones to Long were indeed second-generation hearsay. We have previously recognized that, if multiple levels of hearsay information are submitted in support of a warrant, the *Aguilar–Spinelli* doctrine must be met at each level. *Kvasnikoff*, 804 P.2d at 1306.

The hearsay statements attributed to Long were plainly based on Long's personal observations, however, and thus met the first prong of the *Aguilar–Spinelli* doctrine. The second prong of *Aguilar–Spinelli* was also met: Long's statements were entitled to be deemed presumptively credible, since they amounted to statements of a co-conspirator in furtherance of a conspiracy [6] and were also against Long's penal interest.

against penal interests to bolster credibility, the declarant must not know or suspect that she is communicating with law enforcement officials. *Clark* does not support this contention.

5. For purposes of the *Aguilar–Spinelli* doctrine, the veracity of a statement given by a police informant whose reliability is unknown may be established by a corroborating statement from another informant: "Cross-corroboration among informants is a well-accepted method of demonstrating the validity of the information given." *State v. Prince*, 93 Or.App. 106, 760 P.2d 1356, 1359–60 (1988) (*en banc*) (citations omitted). *See also Commonwealth v. Marzel*, 291 Pa.Super. 553, 436 A.2d 639, 643 (1981); *People v. Clark*, 175 Colo. 446, 488 P.2d 565, 566 (1971) (*en banc*).

6. *See* Alaska Rule of Evidence 801(d)(2)(E); *Stumpf v. State*, 749 P.2d 880 (Alaska App.1988).

7. The argument in Lewis' brief is somewhat cursory on this point and is not altogether clear in specifying the purported misstatements and

In summary, we find no failure of compliance with *Aguilar–Spinelli* here.

## 2. *Misstatements and Omissions*

 We turn next to Lewis' claim that the information presented to the magistrate included various misstatements and omissions. In *State v. Malkin*, 722 P.2d 943, 946 (Alaska 1986), the Alaska Supreme Court held that a warrant based on reckless or intentional misstatements or omissions may be declared invalid. Under *Malkin*, once a misstatement or omission is established, the burden of proving that it was neither reckless nor intentional shifts to the state. *Id.* at 946. A failure to meet this burden will vitiate the warrant if the misstatement or omission is material, that is, if deletion of the misstated information from or inclusion of the omitted information in the original affidavit would have precluded a finding of probable cause. *Id.* A non-material omission or misstatement— one on which probable cause does not hinge—requires suppression only when the court finds "a deliberate attempt to mislead [the magistrate]." *Id.* at 946 n. 6.

 In the present case, Lewis suggests that the testimony in support of the warrant was flawed by several misstatements and omissions.[7] All of these pur-

omissions Lewis relies on. We understand Lewis' brief to suggest that the police affirmatively misstated facts by telling the magistrate: that Sander stated Lewis had given her a particular type of scale—a triple beam balance—when in fact Sander did not specify what type of scale Lewis had given her; that Sander stated she overheard a conversation between Long and Lewis in which Lewis had said "the deal was ready and he [Long] would pick things up later," when in fact Sander had never reported overhearing such a conversation; that Sander said Lewis had a new Mercedes, when in fact she had said Lewis had a blue Mercedes; and that information given to the police by Sander and Jones concerning the financial dealings between Lewis and Long was consistent with certain statements made by Long during his recorded conversation with Jones.

We understand Lewis' brief to suggest, additionally, that the police omitted the following information: that Sander had told police she saw *no drugs during her first visit to Lewis'*

ported misstatements and omissions involve relatively minor details. Our review of the record convinces us that they are not material, either individually or collectively. Moreover, the trial court did not find any of the misstatements or omissions to have been made recklessly or intentionally; nor would the record appear to support such a finding. We conclude that the superior court did not err in failing to suppress on this ground.

### 3. *Staleness*

 As a final ground for challenging the validity of his warrant, Lewis claims that the information before the magistrate was too stale to support a finding of probable cause to search his residence. Lewis points out that, even accepting Sander's and Jones' statements at face value, his last participation in the Seward venture would have been on August 3, two weeks before the warrant's issuance. Given this lapse, Lewis contends that there was no reasonable basis for concluding that any drugs or evidence connected with the venture would still be found in his residence.

Lewis' assertion that evidence of his participation was at least two weeks old, however, overlooks the recorded telephone conversation of August 16 between Long and Jones, in which Long mentioned that he had recently paid Lewis for the cocaine by transferring stock to him. In any event, we have previously held that offenses involving commercial distribution of controlled substances are typically ongoing in nature and that this factor may properly be considered by the issuing magistrate in determining the existence of probable cause. *See, e.g., Morrow v. State,* 704 P.2d 226, 230 (Alaska App.1985).

In denying Lewis' staleness claim, the superior court expressly found evidence of "ongoing cocaine distribution." This finding was not clearly erroneous.

residence; that Sander's and Jones' statements disagreed as to whether Jones had accompanied Sander when Sander picked up the scales from

### IMPROPER FINAL ARGUMENT

At the conclusion of final argument, Lewis moved for a mistrial, contending that the prosecution's rebuttal argument had been improper at two points. The trial court denied Lewis' motion. Lewis revisits his argument here.

### 1. *Background on China Garden Incident*

Both points raised by Lewis below related to his attempted impeachment of Sander, who testified against Lewis at trial. At trial, Lewis established that, following his arrest but prior to his trial, Sander was contacted by the police at an Anchorage restaurant, the China Garden, and was found to be in possession of some white powder, which field-tested positive for and was later determined to be cocaine. Sander, however, was not arrested. After the incident, Sander called her attorney, and then also called Trooper Crawford, who then contacted Officer O'Brien. Both officers had been instrumental in investigating the Seward venture for which Lewis was on trial.

At trial, Lewis cross-examined Sander on the China Garden incident, attempting to establish that she might have agreed to implicate Lewis in the Seward venture in order to avoid being arrested and charged for the new offense. Sander admitted being stopped while possessing cocaine but denied any agreement with the state. On re-direct examination, she testified that, at the time of the China Garden incident, the police told her the powder they seized from her had field-tested negative, so she thought it was not cocaine.

In response to this testimony, Lewis impeached Sander on re-cross by reading from the transcript of a tape recording that the police made during the China Garden incident. The transcript, in relevant part, established that an officer had advised Sander:

Lewis before departing for Seward; and that the police had never verified a transfer of stock from Long to Lewis.

They did a field test on it and it looks like it tested positive initially for cocaine reaction in our test kit. So I don't have a reason to doubt that it probably is cocaine right now. Although we are going to send it off to a lab to make sure. At this point in time right now I don't anticipate at least charging you tonight with that, okay?

After hearing this passage from the transcript, Sander acknowledged its accuracy, saying she had evidently misunderstood the officer's words: "I don't know that's what he told me because I don't understand at that time." At some point before final argument, the parties apparently stipulated that the powder Sander possessed was in fact cocaine.

During final argument, Lewis' counsel strenuously argued Sander's lack of credibility. Counsel suggested that the circumstances surrounding the China Garden incident—that Sander had not been arrested at the time, that she had called Crawford afterward, and that she had never been charged—indicated that the incident might have motivated Sander to incriminate Lewis in return for favorable treatment. In the course of this argument, Lewis' counsel referred to the state's failure to call O'Brien as a witness:

Now we haven't heard from Linda O'Brien in this trial so we don't know what explanation she would offer for why she apparently had not filed charges against Ms. Sander; but it certainly raises some questions.

Somewhat later in the argument, Lewis' counsel also referred to the state's failure to call Sander's cohort in the Seward venture, Jones:

Another question; why haven't we heard from Debbie Jones in this trial? The state has the burden of proof and the state could say I suppose, well, you know, [defense counsel] could have called Debbie [Jones] to testify. I don't have that burden[.]

On rebuttal, the prosecutor responded, in pertinent part, as follows:

And whether or not the China Garden incident somehow affected [Sander's] testimony, as I indicated, she indicated that it was—that there was no [e]ffect on it. Because she didn't know what had happened with that charge. Remember her testimony was she didn't know what had happened. That they actually sent it off to the lab because she had been told by one of the officers that they weren't sure whether or not it was cocaine. And why send it off to the lab if they're so sure. They didn't arrest her that night.

So she doesn't know what that charge has done, but it hasn't affected her testimony, because she's already given statements ... between August 13th and August 15th implicating the defendant. Otherwise how could there be search warrants for the defendant's residence?

The prosecutor also responded to defense counsel's argument concerning the failure of O'Brien and Jones to appear as trial witnesses:

Questions about—or inquiries about who we haven't heard from. Well, it's not [the] defense['s] burden to bring witnesses in, but you saw from Dawn Vogt being in here that they have a subpoena power and that witnesses can come in. They could have called Debbie Jones or Linda O'Brien.

The foregoing comments prompted Lewis' mistrial motion, the denial of which he now appeals.

### 2. Comments Concerning China Garden Incident

We consider initially Lewis' arguments concerning the first disputed prosecutorial comments, which touched on the circumstances surrounding the China Garden incident. Lewis complains that the prosecutor argued beyond the scope of the evidence and impermissibly vouched for Sander's credibility by speculating that a search warrant could not have been issued for Lewis' residence if Sander had not given statements against him shortly before its issuance. Lewis contends that the argument implied that a magistrate had already found Sander's account of Lewis' involve-

ment credible. Lewis claims that the prosecutor's comment was particularly objectionable because it was apparently based on information the jury did not have before it. Lewis cites the ABA Standards for Criminal Justice § 3–5.8(b) (2d ed. 1982) and the ABA Code of Professional Responsibility as authority forbidding the prosecution's expression of personal opinion as to a witness' credibility.

 In presenting closing arguments to the jury, however, counsel may properly discuss the facts actually in evidence and any inferences that can reasonably be drawn therefrom. *Sam v. State*, 842 P.2d 596, 600 (Alaska App.1992); *Dorman v. State*, 622 P.2d 448, 461 (Alaska 1981). In this case, the jury heard testimony that Lewis' residence was searched pursuant to a warrant that was based in part on statements given to the police by Sander. That Sander had implicated Lewis in the Seward venture was a fair inference from this evidence—an inference directly relevant to rebut Lewis' contention that Sander had implicated Lewis for the first time after the China Garden incident, hoping to receive leniency for possessing cocaine. We find nothing in the disputed comments that the jury could reasonably have misconstrued as mere vouching for Sander's credibility.

 Lewis also contends that, in this same portion of the final argument, the prosecution mischaracterized the evidence by falsely suggesting that the substance seized from Sander during the China Garden incident had not field-tested positive and may not actually have been cocaine. As we have already pointed out above, however, after hearing defense counsel read from the transcript of the China Garden incident, Sander acknowledged on re-cross-examination that she had been told the field-test was positive. The prosecution did not dispute the point and, indeed, expressly stipulated that the substance Sander had in her possession was in fact cocaine. The challenged portion of the prosecution's final argument plainly did not insinuate that the field test had actually been negative; instead, it merely focused

on Sander's mistaken belief concerning the results of the field test (a mistake Sander attributed to confusion on her part):

Remember *her testimony was she didn't know* what had happened. That they actually sent it off to the lab because she had been told by one of the officers that they weren't sure whether or not it was cocaine. And why send it off to the lab if they're so sure?

The gist of this argument was that, despite Sander's confusion over the result of the field test, her basic explanation for not having been arrested at the China Garden was accurate: the police were not certain whether the substance she possessed was actually cocaine. Far from suggesting that the field test was negative or that the substance taken from Sander was not actually cocaine, the argument merely emphasized that the police did not think it appropriate to take immediate action based on the field test; they believed it preferable to have a lab test performed before deciding whether to proceed against Sander.

This argument is hardly unsubstantiated or misleading. To the contrary, it is expressly borne out by the transcript of the China Garden encounter. According to the portion of the transcript defense counsel read aloud to Sander on re-cross-examination, the police told Sander that in light of the positive field test they had no reason to doubt that Sander possessed cocaine but that they were nevertheless "going to send it off to a lab to make sure. At this point in time right now I don't anticipate at least charging you tonight." In light of this evidence, the challenged argument did not mischaracterize the record.

### 3. *Comments Concerning Lewis' Failure to Call Witnesses*

 We next consider Lewis' argument concerning the second portion of the final argument disputed below—the portion in which the prosecution commented on Lewis' failure to call O'Brien and Jones as defense witnesses:

Questions about—or inquiries about who we haven't heard from. Well, it's

not [the] defense['s] burden to bring witnesses in, but you saw from Dawn Vogt being in here that they have a subpoena power and that witnesses can come in. They could have called Debbie Jones or Linda O'Brien.

Lewis insists that this comment was improper because it shifted the burden of proof from the state to the defense. But the scope of the impropriety is far from clear.

No Alaska decision has squarely determined the circumstances under which negative comment on a defendant's failure to call witnesses is impermissible. In *McCurry v. State*, 538 P.2d 100, 104 (Alaska 1975) *overruled on other grounds by Howe v. State*, 589 P.2d 421 (Alaska 1979), the Alaska Supreme Court suggested that such comment might be allowed under some circumstances. Noting that the "usual rule" permits comment "when the witness is peculiarly within the control of the defendant and that witness's testimony can reasonably be expected to elucidate matters already at issue," the court declined to find plain error in the prosecutor's comment on McCurry's failure to call his parents to support his alibi defense. *Id.*

The "usual rule" noted in *McCurry* has generated considerable disagreement. Wigmore has criticized it, observing that even in cases where a witness is equally available to both parties, "the more logical view is that the failure to produce is open to an inference against both parties, the particular strength of the inference depending on the circumstances." 2 John H. Wigmore, *Evidence* § 288 (Chadburn rev. 1979). *See also United States v. Beekman*, 155 F.2d 580, 584 (2d Cir.1946).

Some jurisdictions nevertheless continue to apply the traditional version of the rule. *See, e.g., People v. Paylor*, 70 N.Y.2d 146, 518 N.Y.S.2d 102, 103, 511 N.E.2d 370, 371 (1987). Others, in keeping with the spirit of Wigmore's criticism, have relaxed the requirement that a witness be peculiarly within the control of the defendant and have allowed comment on the failure to call any available witness whose testimony "would naturally be expected to be favorable" to the defendant. *People v. Ford*, 45 Cal.3d 431, 247 Cal.Rptr. 121, 131, 754 P.2d 168, 178 (1988) (*en banc*); *Wheatley v. State*, 465 A.2d 1110, 1111 (Del.1983); *State v. Moore*, 620 S.W.2d 370, 373 (Mo. 1981) (*en banc*).

Still other jurisdictions lean in the opposite direction, applying stringent variants of the usual rule. *See, e.g., Dent v. United States*, 404 A.2d 165, 169–70 (D.C.App. 1979) (requiring prior hearing to establish that absent witness is peculiarly within the power of the party to produce, and to establish the likelihood that absent witness would have been "likely to elucidate the transaction"); *Commonwealth v. Niziolek*, 380 Mass. 513, 404 N.E.2d 643, 647 (1980) (comment permissible if the evidence is so strong that the defendant, if innocent, could be expected to call the witness). And at least one state has forbidden comment under all circumstances. *State v. Brewer*, 505 A.2d 774, 777 (Me.1985).

In the present case, both parties pay only cursory attention to the question of whether the prosecutor's comments were improper, and neither offers any meaningful discussion of the relevant case law. Since it appears questionable under the circumstances of this case whether either O'Brien or Jones could naturally have been expected to be favorable witnesses for Lewis, we assume that comment on Lewis' failure to call them would be impermissible under any of the foregoing authorities.

We nevertheless conclude that any impropriety did not warrant a mistrial. Since the prosecutor prefaced his comment by acknowledging that the state, rather than Lewis, bore the burden of proof, it seems unlikely that the jury might have interpreted the comment to suggest that the burden be shifted to the defendant.

More significantly, the disputed comment did little more than echo what Lewis' counsel had already told the jury in his final argument:

The state has the burden of proof and the state could say I suppose, well, you know, [defense counsel] could have called

Debbie [Jones] to testify. I don't have that burden[.]

Given this argument by the defense, the prosecutor's ensuing comment told the jury nothing it had not already heard. In context—as a response to an anticipated argument the defense had voiced to the jury and refuted—the prosecutor's remarks seem to have suggested only that the jury should read no particular significance into either party's failure to call O'Brien or Jones.

■ The trial court had broad discretion to determine the need for a mistrial in light of the disputed comment. Its decision to deny a mistrial is reversible only for an abuse of that discretion. *Hines v. State*, 703 P.2d 1175, 1176 (Alaska App. 1985). Under the circumstances of this case, we find no abuse of discretion.

#### 4. *Comments Concerning Sander's Sentence*

■ Lewis' last claim pertains to a portion of the final argument to which he did not object. We review the claim only for plain error. *Potts v. State*, 712 P.2d 385, 390 (Alaska App.1985).

■ During the rebuttal portion of his final argument, the prosecutor said:

So if you listen to Susie Sander's testimony it's believable because it's consistent, and when you close your eyes it follows. She—the detail, the word choice and with regard to this China Garden incident, that somehow her testimony has been affected by that. Well, first of all, it didn't certainly [a]ffect what she was sentenced to. She wasn't even on proba-

tion then. And what was she sentenced to? 500 hours of community work service, 90 days in jail, and she was convicted of a class B felony. The very same one that [Lewis] is charged with.

Lewis complains that this reference to Sander's sentence was improper because it implied that Lewis would only serve 90 days himself if convicted. Lewis' argument, however, ignores that during the trial the court allowed the jury to hear that Sander had been convicted for delivery of cocaine—the same offense that Lewis was accused of committing—and that she had received a sentence of 90 days with 500 hours of community work. This evidence was admitted without objection on the issue of bias: to respond to Lewis' claim that Sander had agreed to implicate him in return for leniency.

It seems axiomatic that the prosecutor was entitled to argue the evidence to the jury; the fact of Sander's conviction and the nature of her sentence were evidence. The point the prosecutor argued in connection with this evidence was precisely the point for which the evidence was admitted. We find no impropriety, let alone plain error.

### CONCLUSION

The judgment is AFFIRMED.