Martin L. **GILBERT**, Appellant,

v.

**STATE** of Alaska, Appellee.

No. A–4150.

Court of Appeals of Alaska.

March 10, 1995.

---

Gordon G. Goodman, Robinson, Beiswenger & Ehrhardt, Soldotna, for appellant.

John A. Scukanec, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

## OPINION

BRYNER, Chief Judge.

Martin L. Gilbert was convicted by a jury of sexual assault in the first degree, AS 11.41.410(a)(1), and assault in the first degree, AS 11.41.200(a)(2). Gilbert appeals, claiming that the trial court improperly overruled his objection to the prosecutor's final argument, which commented on Gilbert's failure to call a witness in his defense. We reverse.

On the night of April 12–13, 1988, Gilbert, who worked aboard the fishing vessel *Valoris*, went with other members of the *Valoris'* crew to the Yukon Bar in Seward. B.M., a student in the forestry program at the Alaska Vocational Technical Center (AVTech) in Seward, was also at the Yukon Bar. During the last hour to hour-and-a-half before the Yukon Bar's 5:00 a.m. closing, Gilbert and B.M. sat next to each other at the bar and talked to the bartender. Gilbert and B.M. left the bar some time between 4:50 a.m. and 5:00 a.m. They were the last customers to leave. B.M. began walking back toward the AVTech dormitory; Gilbert accompanied her. What happened next was the central dispute at Gilbert's trial.

According to B.M., when she and Gilbert were within viewing distance of the school, Gilbert grabbed her, pulled her off the road, and forcibly raped her; after committing the rape, Gilbert began to choke B.M., and she passed out. When she awoke, Gilbert was gone. B.M. then went to the nearest house with lights on and called the police.

In support of B.M.'s version of events, Jeanette Willis, an AVTech student, testified that, while walking to school early in the morning on April 13, she heard a woman scream; the scream came from a nearby wooded area. Willis looked back and saw someone in the snow. She walked on to the school and called the police shortly after arriving. In a subsequent interview, Willis evidently told that police that, after hearing the scream, she had seen a woman and a man, who was wearing a dark coat, together in the snow. At trial, however, Willis only recalled seeing the woman.

The Seward Police Department received Willis' call at about 5:25 a.m. Officer James Knudson testified that he responded to the call but mistakenly investigated an area about a block away from the area Willis had observed; finding nothing suspicious, Knudson returned to the station. At 6:26 a.m., the police received a second call, this one coming from the house where B.M. went after regaining consciousness. Knudson responded and found B.M., who had obviously been severely battered. B.M. reported the rape.

In his defense at trial, Gilbert did not deny accompanying B.M. as she returned to AVTech from the Yukon Bar, and he acknowledged having sexual intercourse with her in the woods near the AVTech dormitory. According to Gilbert, however, the intercourse was consensual. Gilbert testified that, after he and B.M. had sexual intercourse, B.M. went to sleep. Gilbert tried to wake her, but she did not want to be woken. Gilbert then returned to the *Valoris*. Gilbert insisted that B.M. was asleep and uninjured when he left her.

Given the timing of the two calls that the police had received on the morning of the rape—the first at 5:25 a.m. and the second an hour later—Gilbert theorized that someone must have assaulted and raped B.M. after Gilbert had left her asleep in the wooded area near AVTech. To support this theory, Gilbert called two witnesses. One of the witnesses, Jeffrey Jackson, was living in Arkansas at the time of Gilbert's trial. At the

time of the alleged rape, however, both witnesses had been AVTech students living in the school's dormitory. Both testified that, at approximately 5:15 to 5:30 a.m. on April 13, two intoxicated men, one wearing a dark coat, had knocked on an AVTech dormitory window, trying to gain entry.

Gilbert himself insisted that by 5:30 a.m., he was already back on board the *Valoris*. He explained that he had been anxious to get back to his boat before his skipper woke up; he recalled looking at the clock when he boarded the vessel. In describing his actions, Gilbert mentioned seeing a crewmember as he boarded the vessel:

> Yeah, Bob Olson, one of our deckhands that we'd hired in Seattle, was cooking breakfast or cooking, I don't know if he just got back to the boat or not, but he was awake. And I remember looking at the clock. It was five-twenty something because I was worried whether or not I was getting back before Lloyd [Gilbert's boss] got up....

On cross-examination, Gilbert acknowledged that, in a prior police interview, he had never mentioned seeing Olson when he returned to the boat.

During the rebuttal stage of the state's final argument to the jury, the prosecutor stated:

> [Gilbert's attorney] said the state had the power to produce all these witnesses and ... well, speaking of witnesses, let me ask you a question: Why do you think the defense went to all the effort of bringing Jeff Jackson back from Arkansas but they didn't bother to bring you Bob Olson, this quote Bob Olson that we heard about on Monday, the one man that can presumably give him his alibi? The one man that supposedly is right there when he comes in at five-twenty something in the morning. Ask yourselves and think about that when you listen to what—and reflect on what [defense counsel] is telling you.

Gilbert's attorney objected, asserting that the defense had no burden to produce witnesses and that "there are other considerations as to why Mr. Olson may or may not be here." The trial court, however, overruled the objection. The prosecutor then continued:

> The state's not saying that Mr. Gilbert had any burden of proving anything. I'm just saying if they went to all the trouble of bringing a man here from Arkansas who really doesn't know anything about this case, why do you suppose they didn't go to the effort of bringing somebody here who allegedly saw him at five-twenty in the morning? Think about that. I'll tell you why.... You've heard of the phrase "red herring." That's the job of the defense, to throw out red herrings to distract you.

On appeal, Gilbert contends that the trial court erred in allowing the prosecution to argue that the jury should draw an adverse inference from Gilbert's failure to call Olson as a defense witness.

In *McCurry v. State*, 538 P.2d 100, 104 (Alaska 1975), *overruled on other grounds by Howe v. State*, 589 P.2d 421 (Alaska 1979), the Alaska Supreme Court noted that comment on a defendant's failure to call a witness is usually allowed only when the absent witness is peculiarly within the control of the defendant and when, under the defendant's version of events, the witness could reasonably be expected to provide testimony favorable to the defense. More recently, in *Lewis v. State*, 862 P.2d 181, 190–91 (Alaska App. 1993), after reviewing current case law, this court found that some courts have adopted a more flexible approach, abandoning the requirement that the non-testifying witness be peculiarly within the control of the defendant; these courts allow a negative inference to arise from the defendant's failure to call any witness "whose testimony 'would naturally be expected to be favorable' to the defendant." *Lewis*, 862 P.2d at 190 (quoting *People v. Ford*, 45 Cal.3d 431, 247 Cal.Rptr. 121, 131, 754 P.2d 168, 178 (1988)); *see also Wheatley v. State*, 465 A.2d 1110, 1111 (Del. 1983) (*en banc*); *State v. Moore*, 620 S.W.2d 370, 373 (Mo.1981)(*en banc*).

Courts appear to be particularly disposed toward flexibility in allowing prosecutorial comment on a defendant's failure to call a potentially favorable witness when the witness is an alibi witness mentioned for the first time at trial. *See, e.g., United States v.*

*Schultz,* 698 F.2d 365 (8th Cir.1983); *United States v. Lehmann,* 613 F.2d 130 (5th Cir. 1980); *cf. Commonwealth v. Niziolek,* 380 Mass. 513, 404 N.E.2d 643 (1980). The state relies on these cases: it attempts to characterize the challenged argument in the present case as fair comment on Gilbert's failure to call a previously undisclosed alibi witness.

In our view, however, the state's attempted characterization falls wide of the mark. Although it is undisputed that Gilbert made no mention of Olson before testifying in his own defense at trial, it is inaccurate to portray Olson as a missing alibi witness. Gilbert appears to have mentioned Olson only as a point of reference fixing Gilbert's own recollection of seeing the *Valoris'* clock when he boarded the vessel. At no point in his testimony or in the ensuing final argument of his counsel did Gilbert suggest any significance to his sighting of Olson apart from the tie-in Gilbert personally drew between this observation and his action of looking at the clock. Gilbert did not testify, argue, or imply that Olson, for his part, would have had any occasion to remember the event; indeed, Gilbert's testimony did not even state or suggest that Olson had noticed Gilbert board the *Valoris.*

Furthermore, although it is certainly clear that Gilbert's failure to mention Olson prior to trial rendered Olson unavailable to the state, the record is virtually barren of information establishing that Olson was available to Gilbert. From Gilbert's own testimony, it appears that Olson was a casual acquaintance at best—a deckhand recently hired in Seattle. At no point in its cross-examination of Gilbert did the state inquire about Gilbert's knowledge of Olson's whereabouts or about Olson's availability to Gilbert. No evidentiary basis was presented to support an inference by the jury that Gilbert could have called Olson as a defense witness had he wanted to, and the relationship between Gilbert and Olson is not sufficiently close, standing alone, to support such an inference.

In short, the circumstances of this case simply fail to sustain a rational inference that Olson was a witness who "would naturally be expected to be favorable" to Gilbert. *Ford,* 754 P.2d at 178. It appears, to the contrary, that Olson could most naturally have been expected to be neutral—a witness who, even assuming he was peculiarly available to Gilbert, would likely have had little light to shed on the issues in dispute at Gilbert's trial.

For these reasons, the disputed argument in this case could not be deemed proper under either the *McCurry* approach or the more flexible approach described in *Lewis.* Under either approach, it was unfair for the prosecution to argue that the jury should draw a negative inference from Gilbert's failure to call Olson, because the totality of the evidence at trial could not fairly support such an inference. The prosecution's argument effectively called on the jury to speculate on matters beyond the scope of the evidence and the inferences fairly arising from that evidence. The improper argument was exacerbated by the trial court's denial of Gilbert's timely objection. The court's ruling could readily have been viewed by the jury as an indication that the negative inference proposed by the state could fairly be drawn. At the very least, the court's ruling enabled the prosecution to return to the theme and repeat its improper argument. So nurtured, the seed of unfairness yielded substantial prejudice.[1] We are unable to say that the impropriety did not have a substantial effect on the jury's verdict. *Love v. State,* 457 P.2d 622, 631–32 (Alaska 1969).

Accordingly, we REVERSE.

---

1. The state notes that Gilbert did not move for a mistrial, request a curative instruction, or object to the state's repeated reference to the significance of his failure to call Olson as a defense witness. Given the court's decision to overrule Gilbert's initial objection, however, Gilbert's counsel could properly have concluded that further objection would be pointless and might only result in drawing additional attention to the improper argument.