**STATE of Alaska, Petitioner,**

v.

**Barry A. ANDERSON, Respondent.**

No. A–8257.

Court of Appeals of Alaska.

July 18, 2003.

394.6(4)

---

**17.** *See, e.g., Moran,* 501 P.2d at 771, and authorities there cited.

John A. Scukanec, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Gregg M. Renkes, Attorney General, Juneau, for Petitioner.

Quinlan Steiner, Assistant Public Defender, and Barbara K. Brink, Public Defender, Anchorage, for Respondent.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

STEWART, Judge.

In this case, the superior court found that the police recklessly omitted facts when applying for a warrant to surreptitiously record conversations between a police informant and suspects in a robbery and homicide. The superior court concluded that when the omitted facts were added to the facts presented to the issuing judge, there was no longer probable cause supporting the warrant. Based on our review of the record, we conclude that addition of the omitted information does not undercut the warrant. Accordingly, we reverse the superior court's order and remand for further proceedings.

### Background and proceedings

On the morning of September 25, 1999, the police responded to a reported burglary at Godfather's Pizza on Benson Boulevard in Anchorage. The police found the body of the night manager, Keith Dirkes, in the walk-in freezer. Dirkes had been shot twice in the head with a .45 caliber gun. The day's cash and the back-up cash were missing from the store. The police found no signs of forced entry into the store, and two other employ-

ees who remained at the store until closing said that the front and back doors were locked when they left. Further investigation showed that Barry A. Anderson was a former employee of that Godfather's restaurant and had worked with Dirkes. Anderson had been a closing manager and knew the restaurant's closing routine. The police learned that Anderson had been hanging around the restaurant after closing about a week before the robbery.

On October 7, 1999, an employee of a Footlocker store in Anchorage was robbed at gunpoint when he drove into the parking lot of the Northrim Bank on Old Seward Highway to drop off the night's deposit. There were two robbers, and the employee described the one without a gun as an African-American man wearing a green jacket. He described the gun as a chrome, large-caliber, semi-automatic handgun. Shortly after the police responded to this robbery report, an officer saw a car on Old Seward driven by an African-American man in a green jacket. The driver, Bert Oliver, was a former employee of Footlocker and had worked with one of the robbery victims. He consented to a search of the car and police found two black ski masks, a bullet-resistant vest, and a loaded magazine to a .45 caliber semi-automatic handgun. The police also found a package of developed film in the trunk with the name "E. Colvin" on it. Oliver said the car belonged to his friend, Eric Colvin, and, in fact, the car was registered to Colvin. Police showed a photo of Colvin found in the trunk to the victim, but the victim did not identify Colvin as a suspect. Oliver worked at the Subway shop at University of Alaska Anchorage (UAA).

On October 13, 1999, Jeff Tynes reported that someone stole a UAA van parked on campus. Tynes had been delivering pastries and collecting deposits from a coffee shop on campus and said that while he used the restroom, he left the keys in the van. He also left a money bag underneath the seat that contained a total of $3536.30.

Tynes was charged with theft after making incriminating statements that the police recorded pursuant to a *Glass* warrant.[1] Tynes

---

1. *See State v. Glass,* 583 P.2d 872 (Alaska 1978), *on reh'g,* 596 P.2d 10 (Alaska 1979) (holding that the Alaska Constitution requires police to obtain judicial authorization before secretly recording a person's private conversations).

told the police that his cousin, Eric Colvin, worked at the Subway at UAA, and that Colvin knew the delivery schedule of the van but did not know that Tynes carried money from other deliveries. On the day of the theft, Colvin arrived at work late—an hour and twenty minutes after the theft. After that day, Colvin never returned to Subway.

On the evening of October 17, 1999, the Cash Alaska pawn shop on Spenard Road was robbed by two gunmen, one of whom brandished a silver Ruger semi-automatic pistol. One gunman took jewelry that had not yet been placed in a safe. The other gunman walked past two locked safes and directed the employees to open a third, which happened to be the only safe to which the employees had a combination. This led one of the employees to believe the gunman had inside information about the safes.

Police learned that a Ruger P90 .45 caliber handgun was missing from the Cash Alaska pawn shop on Muldoon and that Anderson, who worked at the store, had inventoried that gun about a month before the Spenard robbery. Anderson was also working at the Spenard Cash Alaska when the robbery occurred.

Police later arrested Anderson for the Spenard Cash Alaska robbery when he took jewelry stolen in the robbery to a jeweler to have the gems removed. The police interviewed Anderson on November 5, 1999, and he stated that he knew of a plan to rob a Cash Alaska shop by a person named "Eric." Anderson said the Cash Alaska robbery was Eric's idea, that he told Eric not to do it, but that Anderson's "cut was gonna be . . . to get the [gems] taken out and just to sell 'em and I get to keep whatever." Anderson said he met with Eric four days after the robbery and that Eric gave Anderson some jewelry plus about $500 cash. Anderson also claimed that Eric committed the Footlocker robbery and the UAA theft, relating some accurate details of both crimes.

On December 9, 1999, Detective Barth interviewed Carlos Newton, a friend of Colvin's. Newton insisted that Colvin ("Eric") was innocent and that he had heard that Anderson had committed the Cash Alaska robbery. Barth told Newton he was convinced that Colvin was involved in the Cash

Alaska, Footlocker, and UAA crimes. Barth suggested that Newton wear a wire against Colvin, but Newton refused.

On December 15, 1999, Detective Vanderveur interviewed Newton again. Newton indicated that he heard that Anderson shot Dirkes during the Godfather's robbery/homicide. Detective Vanderveur informed Newton that there was a $15,000 reward for information leading to the conviction of the Godfather's perpetrator. The police again suggested Newton wear a wire to speak with Colvin, but Newton suggested that they have Colvin wear a wire and speak with Anderson instead. Detective Vanderveur told Newton to tell Colvin to contact him or the District Attorney through his attorney if he wished to cooperate, and Detective Vanderveur gave Newton his card and the District Attorney's phone number.

Eventually, Colvin contacted the police and was interviewed again on January 14, 2000. Colvin told Detective Vanderveur that he had been present when Anderson and another man, Carlos Adams, described the Godfather's robbery/homicide. They said that Dirkes let Anderson and Adams in the store because Dirkes knew Anderson. According to Colvin, Anderson said he looked for both shell casings after shooting Dirkes, but found only one. Colvin reported that Anderson obtained the gun from the Muldoon Cash Alaska after an inventory.

Colvin also said that Adams told him that Anderson wanted the gun discarded, and Colvin drove Adams north of Anchorage where Adams threw the gun in the Knik River. Colvin described where Adams disposed of the gun and later led the police to that location. The police recovered the gun, a Ruger P90 .45 caliber pistol, later confirmed as the weapon used to kill Dirkes. There was no clip in the weapon when it was found.

Colvin and the State entered into a plea agreement. The agreement provided that Colvin's unrelated forgery charges would be reduced to one misdemeanor charge and that he would serve no additional jail time in exchange for his cooperation in electronic surveillance of Anderson and others. A clause provided that the agreement would be

void if the State determined that Colvin had participated in "any armed robbery, including the robbery of the Godfather's Pizza on September 25, 1999, or the robbery of Cash Alaska on October 17, 1999."

Assisted by the District Attorney's office, Detective Vanderveur applied for a *Glass* warrant to record conversations between Colvin and Anderson. The affidavit filed with the application included some, but not all, of the facts described above. Both Vanderveur and Colvin testified in support of the warrant. Vanderveur did not mention anything about the Footlocker robbery or the UAA theft in his affidavit or testimony; in particular, he did not mention that Colvin had been implicated by Anderson in both crimes. Vanderveur told Superior Court Judge Elaine M. Andrews that Colvin had a criminal record but failed to mention that a 1996 robbery charge was for armed robbery with a handgun; that charge had been reduced to misdemeanor assault. Vanderveur did not provide Judge Andrews with a copy of Anderson's November 5th statement, Colvin's December 8th statement, or either of the interviews with Newton. Vanderveur did not inform Judge Andrews that police had suspected that the Godfather's, Footlocker, Cash Alaska, and UAA incidents were connected and that Colvin's name had come up in the Cash Alaska, Footlocker, and UAA investigations.

Judge Andrews issued the *Glass* warrant, explicitly finding that Colvin's testimony was corroborated by the fact that he led the police to the murder weapon and that he had known that only one shell casing remained at the scene of the crime.

Anderson moved to suppress his recorded statements under *State v. Malkin*,[2] arguing that the *Glass* warrant was invalid because Detective Vanderveur intentionally or recklessly omitted material facts. An evidentiary hearing was held before Superior Court Judge Michael L. Wolverton on February 15–16, March 30, and April 9–10, 2001. Judge Wolverton did not find that any facts

were intentionally omitted, but he found that certain facts were recklessly omitted and granted Anderson's motion. Judge Wolverton suppressed the wired conversations seized when the *Glass* warrant was executed. The State appeals this ruling.

*Discussion*

In *Lewis v. State*,[3] we described the *Malkin* analysis as follows:

> [O]nce a misstatement or omission is established, the burden of proving that it was neither reckless nor intentional shifts to the state. A failure to meet this burden will vitiate the warrant if the misstatement or omission is material, that is, if deletion of the misstated information from or inclusion of the omitted information in the original affidavit would have precluded a finding of probable cause. A non-material omission or misstatement—one on which probable cause does not hinge—requires suppression only when the court finds "a deliberate attempt to mislead [the magistrate]." [4]

We employ differing standards of review in this analysis. A finding that an officer recklessly omitted or misstated facts will be upheld unless we are convinced the finding is clearly erroneous.[5] However, we exercise independent judgment on the question whether the evidence presented in support of the warrant (after adding reckless omissions under *Malkin*) is sufficient to establish probable cause.[6]

Judge Wolverton found that Detective Vanderveur recklessly omitted material facts in his search warrant affidavit and testimony before Judge Andrews. Among the facts Judge Wolverton found were omitted included the fact that, in addition to the Cash Alaska robbery, Anderson had also implicated Colvin in the UAA theft and the Footlocker robbery. He found that Vanderveur recklessly failed to inform Judge Andrews that the police believed there might be a connection between all of these crimes, including the Godfather's robbery/homicide, and that

**2.** 722 P.2d 943 (Alaska 1986).

**3.** 862 P.2d 181 (Alaska App.1993).

**4.** *Lewis,* 862 P.2d at 186 (quoting *Malkin,* 722 P.2d at 946 & n. 6) (citations omitted).

**5.** *See Lewis v. State,* 9 P.3d 1028, 1033 (Alaska App.2000); *Blank v. State,* 3 P.3d 359, 365 (Alaska App.2000); *McLaughlin v. State,* 818 P.2d 683, 685–86 (Alaska App.1991).

**6.** *See Lewis,* 9 P.3d at 1033.

police reports in the UAA theft and Footlocker robbery (which Vanderveur never read nor provided to Judge Andrews) mentioned that Colvin had connections with both of these crimes. Judge Andrews was not informed that Colvin also had a connection to the same type of weapon believed to have been used in the Godfather's and Cash Alaska incidents. Judge Wolverton also found that the police recklessly omitted the fact that the weapon recovered with Colvin's assistance had no "clip" (magazine) and that a magazine for the same caliber handgun was found in Colvin's car shortly after the Footlocker robbery.

In addition to Colvin's connection to the UAA and Footlocker crimes, Judge Wolverton found that other facts bearing upon Colvin's credibility had been omitted: that in his first interview, Colvin lied about knowing Anderson, refused to take a polygraph test, and was informed that Anderson had implicated him in the UAA and Footlocker crimes; that information corroborating Colvin's testimony had been disclosed to Anderson, who later spoke to Colvin; and that Colvin may have been motivated to cooperate with police only after his friend, Newton, related information Newton had learned during an interview with Detective Barth. The information Newton may have told Colvin included the existence of a substantial cash reward for information on the Godfather's robbery/homicide, that police "knew" Colvin was responsible for the Footlocker and UAA crimes, and that the gun clip seized from Colvin's car matched the murder weapon (which has not been established).

The State does not dispute that Detective Vanderveur omitted information in his warrant affidavit and testimony, but contends that the omitted facts were immaterial or that Judge Wolverton erred when he found the officer recklessly omitted the facts. Most of these findings depend on Judge Wolverton's view of the credibility of the witnesses who testified over the course of several days of evidentiary hearings.

■ Even so, two of Judge Wolverton's findings are clearly erroneous. First, Judge

Wolverton's finding that Anderson spoke to Colvin after the police told Anderson that they had recovered a shell casing at Godfather's is not supported by the record before us. At the warrant hearing before Judge Andrews, Colvin denied having had any contact with Anderson or Adams after being arrested for the forgeries. Colvin also repeatedly denied having had any conversations with Anderson during his January 14 statement to police. Colvin explained that he could not have spoken with Anderson after returning from Alabama because Anderson was already incarcerated and even though he had seen Anderson in custody at the jail, Colvin did not think that Anderson saw him or knew he was there. No evidence contradicts this testimony before Judge Andrews, and Colvin did not testify before Judge Wolverton. Therefore, we conclude that the trial court's finding that "police had in fact disseminated some of Colvin's so-called corroborative details through interviews with … Barry Anderson … [who] later spoke with Colvin" is clearly erroneous.

■ Additionally, Judge Wolverton's finding that Judge Andrews was not informed that the handgun recovered with Colvin's assistance had no "clip" or magazine in it is clearly erroneous. Detective Vanderveur noted this fact in the affidavit he filed in support of the *Glass* warrant.

We turn next to the question whether including the remaining omissions in the evidence supporting the warrant "would have precluded a finding of probable cause."[7] Although the State argues that Judge Wolverton erroneously found the remaining omissions to be reckless and material, we need not address these claims. We conclude that adding the remaining omissions found by Judge Wolverton to the evidence presented to Judge Andrews does not preclude a finding of probable cause.

■ In *State v. Joubert*,[8] the Alaska Supreme Court ruled that probable cause "requires only a fair probability or substantial chance of criminal activity, not an actual showing that such activity occurred."[9]

---

7. *Lewis*, 862 P.2d at 186.

8. 20 P.3d 1115 (Alaska 2001).

9. *Id.* at 1119 (quoting *Van Sandt v. Brown*, 944 P.2d 449, 452 (Alaska 1997)).

Probable cause is an objective standard.[10]

The evidence presented to Judge Andrews showed there were no signs of forcible entry at Godfather's. The employees who remained at the store until after it was closed to walk-in customers indicated that the front and back doors were locked when they left, which suggests that Dirkes opened the door to his attackers after closing. Dirkes knew Anderson because Anderson was a former employee at that Godfather's restaurant and had worked with Dirkes. Anderson himself had been a closing manager and knew the closing routine, so he understood when the store was closed and when the other employees would be gone. And Anderson had been seen hanging around the restaurant after closing about a week before the robbery.

There was also evidence that Anderson was involved in the Spenard Cash Alaska robbery. Anderson was working there when the robbery occurred. The employees told police that a gunman stole some jewelry that had not yet been put into a safe. Although there were three safes at the back of the store, the gunman directed them to open the only safe for which the employees had the combination. Anderson was arrested for the Cash Alaska robbery after police learned he had taken jewelry stolen in the robbery to a jeweler to have the gems removed. And during the subsequent police interview, Anderson admitted he was aware of a plan to rob a Cash Alaska pawn shop by "Eric," but claimed that he only had the jewels because Eric had given them to him.

Other information connected Anderson to the handgun that killed Dirkes and that the police thought was used during the Cash Alaska robbery. One of the employees present during the Cash Alaska robbery said the robbers brandished a silver "Ruger semi-auto pistol." A Ruger P90 .45 caliber handgun turned up missing from the Muldoon Cash Alaska pawn shop after Anderson inventoried the guns at that location, about a month before the Spenard Cash Alaska robbery and about a week before the homicide.

With Colvin's assistance, the police recovered a gray Ruger P90 .45 caliber pistol from the Knik River and confirmed it as the weapon used to kill Dirkes.

Colvin told the police and testified before Judge Andrews that Anderson had admitted his involvement in the homicide in front of several people. Colvin testified that Anderson said he looked for the two shell casings after shooting Dirkes but could find only one. At that time, the police had not publicly announced that only one shell casing had been discovered at the scene.

Judge Andrews described Colvin as an informant from the criminal milieu. She knew that Colvin had a record of crimes of dishonesty and that his first statements to the police were not truthful. Judge Andrews acknowledged that there were objective reasons to doubt Colvin's credibility, but when Colvin testified, Judge Andrews questioned him closely about the plea agreement and warned him that the police may have more information than he might realize. She added that if he was not telling the truth, he would be "in very significant trouble" and lose the benefits of the plea agreement.

In earlier cases, we have noted that an informant's credibility can be bolstered when the informant aids the authorities and takes the risk that the authorities will discover that the information the informant has provided is not true.[11] And Colvin not only cooperated with the authorities, he took the additional step of appearing before Judge Andrews and testifying under oath so that the State might obtain the authorization to record conversations between Colvin and Anderson.[12] Judge Andrews thought that the physical evidence, the Ruger handgun and the single shell casing found at Godfather's, were "very persuasive pieces of physical corroboration[.]" She knew there were reasons to distrust Colvin's account, but under the circumstances, she credited his information and issued the warrant.

**10.** *Reeves v. State,* 599 P.2d 727, 741 n. 44 (Alaska 1979).

**11.** *See Gustafson v. State,* 854 P.2d 751, 757 (Alaska App.1993); *State v. Bianchi,* 761 P.2d 127, 131 (Alaska App.1988).

**12.** *See McLaughlin,* 818 P.2d at 686 (an informant's appearance before a magistrate and willingness to submit to an oath and questioning by the magistrate provides a sound basis for assessing the informant's credibility).

The facts that Judge Wolverton found were omitted recklessly provide additional information that could be used in an analysis of Colvin's credibility. But based on our review of the record, we conclude that the evidence presented to Judge Andrews, when combined with the omissions identified by Judge Wolverton, still demonstrates "a fair probability or substantial chance" that Anderson was connected with the Godfather's homicide.[13] The police investigation showed that Dirkes had been shot twice with .45 caliber bullets. Anderson was connected to the Godfather's restaurant and to the .45 caliber Ruger handgun missing from the Muldoon Cash Alaska. Anderson knew Dirkes because he had been a co-worker with Dirkes at Godfather's and, because Anderson had also been a night manager at Godfather's, he was familiar with the closing routine. Anderson had been seen around the restaurant at closing a few days before the homicide. There was no sign of forced entry, which tended to show that Dirkes let the person who killed him inside the restaurant because he knew the person. Anderson also had worked at the Muldoon Cash Alaska where he had inventoried the missing .45 caliber Ruger handgun shortly before the homicide.

Colvin testified that Anderson admitted his involvement in the Godfather's robbery and homicide. He said that Anderson told him that he shot Dirkes twice but recovered only one of the shells. This meshed with the police investigation. And Colvin led the police to a place on the shore of the Knik River where Colvin saw a cohort of Anderson's throw a handgun in the water. The police searched this place and found the murder weapon. While the additional facts added to the evidence are relevant to an analysis of Colvin's credibility, "the very persuasive pieces of physical corroboration" cited by Judge Andrews still remain. Based on our analysis of the evidence presented to Judge Andrews and the additional facts that must be added pursuant to Judge Wolverton's findings, we conclude that the additional facts do not preclude a finding of probable cause. Accordingly, we reverse the superior court's order suppressing the taped conver-

sations obtained when the police executed the *Glass* warrants.

*Conclusion*

The order of the superior court suppressing the taped conversations obtained when the *Glass* warrants were executed is REVERSED.

---

**13.** *See Joubert,* 20 P.3d at 1119 (quoting *Van* *Sandt,* 944 P.2d at 452).